No. 26,074.

EMERAE PARMAN, a Minor, by J. T. PARMAN, His Next Friend, *Appellee*, v. WILLIAM LEMMON, a Minor, and W. G. LEMMON, His Father and Natural Guardian, and W. G. LEMMON, *Appellants*.

SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Acts Constituting—Violation of Criminal Statute*. In order for the violation of a criminal statute to constitute actionable negligence the injury complained of must be of the sort the legislation was intended to prevent, following *Denton v. Railway Co.*, 90 Kan. 51, 133 Pac. 558.

2. WEAPONS—*Dangerous Weapons*. A twenty-gauge Winchester pump shotgun is a dangerous weapon, the possession of which by a minor or person of notoriously unsound mind is prohibited by chapter 105 of the Laws of 1883. (R. S. 38-701, 38-702.)

3. NEGLIGENCE—*Giving of Dangerous Weapon—Liability*. Where a father places in the hands of his fourteen-year-old son a shotgun such as described in the preceding syllabus he is liable in damages to one suffering an injury caused by the negligent shooting of the gun by his minor son.

4. SAME—*Generally*. Various errors considered and held not to be well taken.

Appeal from Chautauqua district court; GEORGE J. BENSON, judge. Opinion filed October 10, 1925. Affirmed.

1. Negligence, 29 Cyc. p. 438; 9 L. R. A., n. s., 338; L. R. A. 1915E, 500; 20 R. C. L. p. 40. 2. Weapons, 40 Cyc. p. 852. 3. Id., 40 Cyc. p. 873; L. R. A. 1915C, 460. 4. Sunday, 37 Cyc. p. 574; Weapons, 40 Cyc. pp. 853, 874.

*Carl Ackarman,* of Sedan, *Frank Doster* and *J. E. Addington,* both of Topeka, for the appellants.

*C. W. Spencer,* of Sedan, and *A. F. Sims,* of Howard, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The action was one to recover damages for the loss of an eye. Plaintiff prevailed, and defendants appeal.

Two boys, William Lemmon and Emerae Parman, went duck hunting Sunday, October 8, 1922. William was past fourteen and Emerae sixteen. William fired at a hell-diver (dabchick or grebe) on a small pond. Some of the shot glanced on the water to where Emerae was standing, one striking him in one of his eyes, putting it out. Action was brought on behalf of the injured boy against William Lemmon for negligently inflicting the injury, and against W. G. Lemmon, his father, for negligently furnishing his minor son with a dangerous weapon, a shotgun.

This was not William's first gun. His father had furnished him a 410 shotgun when he was ten years of age. Sometime before the injury complained of he bought and gave his son the gun in question —a new twenty-gauge Winchester pump shotgun. William frequently took his father's car and his gun and took other boys on hunting trips, and had on other occasions taken plaintiff. On the day of the accident he took his father's car and his gun, drove down and got the plaintiff and the two went duck hunting. After killing some ducks on a pond, they started around the pond in opposite directions to pick up the ducks they had killed, and when opposite each other across the pond, William fired at a hell-diver on the pond, so directly in line with the plaintiff that several of the glancing shot hit the plaintiff. One put out his eye.

In a trial to a jury the principal questions argued were whether, under the circumstances and the instructions of the court, the injury was the result of W. G. Lemmon, the father, placing the gun in the hands of his minor son, as against the father, and the possession by the minor of the gun, and whether the plaintiff was himself guilty of contributory negligence. The jury returned a general verdict for $5,000 for plaintiff, and answered special questions as follows:

"Q. Was the plaintiff guilty of contributory negligence as defined in the instructions? A. No.

"Q. What was the direct or proximate cause of the injury to plaintiff? A. By twenty-gauge shotgun furnished by W. G. Lemmon and fired by William Lemmon, a minor.

"Q. State whether or not the defendant, William Lemmon, shot at and killed a hell-diver in the pond on the Sanborn farm, and at the time he shot how far away from him was the hell-diver? A. Yes. Approximately fifteen feet.

"Q. How far from William Lemmon was the plaintiff, Emerae Parman, at the time that the shot was fired that was supposed to have injured plaintiff? A. About 110 feet."

Statutes against furnishing dangerous weapons to minors, and against minors having dangerous weapons in possession, read:

"Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons, to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars." (R. S. 38-701.)

"Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nor more than ten dollars." (R. S. 38-702.)

The defendants contend that the sole question in the case is whether the violation of a penal statute enacted in the general interest of the public at large can be made the basis of a private action for damages. They argue that the mere violation of a penal statute not enacted in the interest of special classes or individuals, but for the protection of the general public, does not constitute actionable negligence because injury ensues, because in order to constitute liability for negligence there must be a lack of caution as to a particular person or class. Some cases sustaining this view are *Taylor v. Lake Shore & Mich. S. Ry.*, 45 Mich. 74; *Cook v. Johnston*, 58 Mich. 437; *Hartnett v. Boston Store*, 265 Ill. 331. See, also, extensive notes in 9 L. R. A., n. s., 338 and L. R. A. 1915C 460; 36 Am. St. Rep., 817.

The distinction sought to be made has not always been kept in view, and is sometimes shadowy, which, in a general way, serves to explain the divergence in the decisions. (*Harrod v. Latham*, 77 Kan. 466, 94 Pac. 11.) Similar statutes to those invoked here are in force in many of the states. In our opinion they are protective laws enacted to prevent occurrences such as happened in the instant case. It has frequently been held that the violation of such statutes resulting in injury constitutes actionable negligence or negligence *per se.*

In *Denton v. Railway Co.*, 90 Kan. 51, 155 Pac. 558, it was said in the opinion:

"In order for the violation of a statute to constitute actionable negligence the injury complained of must be of the sort the legislation was intended to guard against. . . . 'In order to render the violation of a statute or ordinance actionable negligence the consequence which resulted from such negligence must have been those contemplated by the provision.' (29 Cyc. 438.) . . . 'Negligence is a breach of duty. Those only to whom that duty is due and who have sustained injuries of the character its discharge was designated to prevent can maintain actions upon it.' (*Chicago G. W. Ry. Co. v. Minneapolis, St. P. & S. M. Ry. Co.*, 100 C. C. A. 41, 45, 176 Fed. 237.) . . . The rule referred to results from a special application of the broader principle that the object of the statute must be looked to in order to determine who may invoke its benefits. The test whether an individual injured by the violation of a penal statute may recover damages from the wrongdoer is whether the legislature intended to give such right. (*Harrod v. Latham*, 77 Kan. 466, 94 Pac. 11; 1 Cyc. 679.) A matter necessarily to be considered in applying that test is whether the lawmakers had similar injuries in mind and designed to prevent them." (pp. 53, 54.)

The title of the original bill (house bill No. 99) from which the statute comes, reads: "An act to prevent selling, trading or giving deadly weapons to minors, and to provide punishment therefor." (See House Journal, 1883.) The words "or toy pistol" were added to the title and the bill made to cover toy pistols during its course of enactment, showing that it was first the intention of the legislature to guard against the use of deadly weapons, or dangerous weapons (which by their inherent nature were such), and afterwards made the act to include even the lesser dangerous weapons. Inasmuch as the principal terms of the title to the act are *minors* and *deadly weapons*, we conclude that the purpose of the statute was to keep out of the hands of minors and incompetent persons weapons usually regarded as deadly or dangerous.

In 13 Cyc. a "dangerous weapon" is defined as "a weapon likely to produce death or great bodily harm, or dangerous to life." Deadly weapon as "any weapon likely to produce death, any weapon by which death may be produced, a weapon dangerous to life, likely to produce bodily injury from the use made of it, . . . or with which death may be easily and readily produced." (See pages 257, 283, 284. See, also, *The State v. Bloom*, 91 Kan. 156, 136 Pac. 951.)

On behalf of defendants it is suggested that under the rule of *ejusdem generis* a shotgun is not included in the words "other dangerous weapons" used in the statute.

"The rule *ejusdem generis* ordinarily limits the meaning of general words to things of the same class as those enumerated under them." (2 Words & Phrases, 226, 227.)

Applying this general rule to the question, we have a title specifying minors and deadly weapons. The act enumerates pistol, revolver, toy pistol, dirk, bowie knife, brass knuckles, slung shot and "other dangerous weapons." Can it be said that a Winchester rifle or repeating shotgun placed in the hands of an insane or incompetent person is not a weapon that is inherently dangerous to himself and his associates? The answer is obvious. The only question is whether the expression "other dangerous weapons" shall be restricted so as to exclude shotguns and rifles because not specifically mentioned in the statute.

In 2 Words and Phrases, 226, it is said:

"The doctrine of *ejusdem generis* is only a rule of construction to be applied as an aid in ascertaining the legislative intent, and does not control where it clearly appears from the statute as a whole that no such limitation was intended, nor does it apply where the specific words of a statute signify subjects greatly different from another, nor where the specific words embrace all objects of their class, so that the general words must bear a different meaning from the specific words or be meaningless."

In *United States Cement Co. v. Cooper,* 172 Ind. 599, it was said:

"The rule of *ejusdem generis* requires the restriction of general words to the same kind of genus as the preceding particular words, and the sole object of the rule is to assist the court in determining the true meaning of the statute." (Syl. ¶ 11. See, also, *The State v. Eckhardt,* 232 Mo. 49.)

In *Drainage Commission of New Orleans v. National Contracting Co. of New York,* 136 Fed. 780, it was said:

"The rule *ejusdem generis,* the rule *exclusio unius,* the rule invoked in this case that 'the particular governs the general,' and perhaps other rules still, are mere subordinate and auxiliary formulas intended to assist in the application of the basic rule that the intent of the parties governs. Neither in law nor in ordinary logic can there be an inflexible rule by which parties are arbitrarily held to forego a general requirement merely because they also state a particular one." (p. 794.)

A pistol and a revolver (which belong to the same class of dangerous weapons as shotguns and rifles, all using explosive cartridges), mentioned in the statute under consideration, are recognized everywhere as dangerous to boys and their associates. The particular words "pistol" and "revolver" designate a class or species of weapon in the popular mind inherently dangerous. A baseball bat, which

could be made a dangerous weapon, on the other hand, would be looked upon as not dangerous.

It would hardly be argued that one who sold a shotgun or repeating rifle to an admittedly insane person would not be guilty of a violation of this law. There is no good reason why the statute should be restricted to only such deadly or dangerous weapons as specifically named when it plainly says "other dangerous weapons." The statute is protective in its nature and wholesome in effect. The accident was precisely one of those which the statute was designed to prevent.

*Burrell v. Horchem,* 117 Kan. 678, 232 Pac. 1042, was an action for damages brought against Charles Horchem and his son Harold. Harold, who was twelve years of age, drove a car belonging to his father and used the lights in such a way as to blind the plaintiff, who drove into a culvert and wrecked his car. The statute there involved provides that—

"It shall be unlawful for any person under fourteen years of age or for any intoxicated person to operate a motor vehicle, and any owner, dealer or manufacturer of motor vehicles who permits a person under fourteen years of age or an intoxicated person to operate a motor vehicle shall be deemed guilty of a misdemeanor and shall be punished as hereinafter provided for violation of the provisions of this act." (R. S. 8-121.)

The court said:

"The purpose of the statute was, of course, general protection of persons and property from danger consequent upon operation of motor vehicles by persons incompetent to manage them. Included within this general purpose was the purpose to make travel on the public highways safer. Indeed, that was the chief purpose, because the danger sought to be avoided was more frequently encountered on public highways than elsewhere. This being true, plaintiff, as a traveler on the highway, was a member of a class which the statute was designed to protect, and may recover damages which resulted proximately from violation of the statute. (*Harrod v. Latham,* 77 Kan. 466, 470, 95 Pac. 11; *Denton v. Railway Co.,* 90 Kan. 51, 133 Pac. 558; Note L. R. A. 1915E 500.) . . . It is customary to classify a breach of statutory duty resulting in injury to one to whom the duty is owed as actionable negligence." (pp. 680, 681.)

In *Larkey v. Church,* 79 Okla. 202, it was said:

"The violation of a municipal ordinance passed in the proper exercise of police power, in the interest of public safety and not in conflict with the general law, is negligence *per se,* and where such act of negligence by the defendant is the direct and proximate cause of the injury, not directly contributed to by want of due care on the part of the injured person, the defendant is liable." (See, also, *Marlan Refining Co. v. Duffy,* 94 Okla. 16, 220 Pac. 846; *Freeborn v. Holt,* [Okla.] 227 Pac. 136.)

Parman v. Lemmon.

In *Binford v. Johnston*, 82 Ind. 426, 42 Am. Rep. 508, it was said:

"Two boys, one aged ten and the other twelve years, purchased of a dealer cartridges for use in a toy pistol and were instructed by the dealer how to use them. It was against the statute to sell pistol cartridges to minors. The dealer knew of the dangerous character of the article and that the boys were unfit to be intrusted with them. Another boy, six years old, shortly afterwards picked up a toy pistol containing one of the cartridges, and discharged it, killing one of the boys who bought the cartridges. *Held*, that the dealer was liable for the death of the boy killed." (Syl.)

In the opinion it was said:

"A man who places in the hands of a child an article of a dangerous character, and one likely to cause injury to the child itself or to others, is guilty of an actionable wrong. If the dealer should sell to a child dynamite, or other explosive of a similar character, nobody would doubt that he had committed a wrong for which he should answer in case injury resulted. So if a druggist should sell to a child a deadly drug, likely to cause harm to the child or injury to others, he would certainly be liable to an action. . . . Under the rule declared in the cases referred to, it is clear that one who sells dangerous explosives to a child, knowing that they are to be used in such a manner as to put in jeopardy the lives of others, must be taken to contemplate the probable consequence of his wrongful act. It is a probable consequence of such a sale as that charged against appellant, that the explosives may be so used by children, among whom it is natural to expect that they will be taken, as to injure the buyers or their associates. . . . There are many well-reasoned cases which, carrying the doctrine still further, hold that one who places a dangerous thing in a position where it is likely to cause injuries to others is liable to a child who is injured, although he may be a trespasser."

A Pennsylvania statute reads:

"Any person who shall knowingly and willfully sell or cause to be sold, to any person under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon, or who shall knowingly and willfully sell or cause to be sold to any such minor any imitation or toy cannon, revolver or pistol, so made, constructed or arranged as to be capable of being loaded with gunpowder or other explosive substances, cartridges, shot, slugs or balls, and being exploded, fired off and discharged, and thereby become a dangerous or deadly weapon, or who shall knowingly and willfully sell or cause to be sold to any such minor any cartridge, gunpowder or other dangerous and explosive substance, shall, in every such case, be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to pay a fine not exceeding three hundred dollars. (1881, June 10; P. L. 111, section 1.)" (Pa. St. 1920, § 10595.)

In *McMillen v. Steele*, (Pa.) 119 Atl. 721, it was said:

"Plaintiff's son died as a result of a gunshot wound inflicted by a minor child under the age of sixteen, who had purchased the gun at defendant's store. . . . The act of June 10, 1881, sec. 1 (P. L. 111; Pa. St. 1920, sec. 10595) makes any person who 'shall knowingly and willfully sell, or cause to be sold, to any person under sixteen years of age, any cannon, revolver, pistol

or other such deadly weapon,' guilty of an offense. . . . When defendant sold the shell to Samuel (a minor), he violated the statute, thereby making himself liable for any natural or probable harmful result which might follow in the wake of his wrongful act. (*Shaffer v. Mowery,* 225 Pa. 300, 303, 108 Atl. 654, 655.) Any ordinary discharge of a firearm is a natural and probable result of its use, and, as affecting the minor purchaser's right of recovery or that of anyone injured by him through an unlawful sale and use of a firearm, the minor's negligence in handling the gun is not material. The storekeeper seller cannot escape responsibility by reason of the negligence of the boy to whom he sells. The act is drastic and intends to put a stop to such sales by imposing an unusual responsibility on the seller. See *Stehle v. Jaeger, Automatic Machine Co.,* 225 Pa. 348, 351, 352, 74 Atl. 215, 133 Am. St. Rep. 884." (pp. 721, 722.)

In 40 Cyc. 872, it is said:

"RIGHT OF ACTION. Persons handling firearms in the immediate vicinity of others are held to a very high degree of care and are liable for injury to another in his person or property resulting from the discharge of said firearms, even though the discharge is accidental and unintentional, provided it is not unavoidable. This rule is strict enough to fix liability upon one who negligently allows another person in his control to inflict injury with a weapon, such as a father negligently permitting his minor child to have firearms or leaving them where the child may get possession of them. A person unlawfully armed or unlawfully firing a gun is negligent *per se* and is liable for any injuries he inflicts with his weapon, even though the person injured knew that defendant was armed and consented thereto." (See, also, *Shaffer et ux. v. Mowery,* [Pa.] 108 Atl. 654; *Evans v. Waite,* 83 Wis. 286, 53 N. W. 445; *Charlton v. Jackson,* 183 Mo. App. 613, 167 S. W. 670; *Parker v. Brainard,* 135 Mass. 116, 46 Am. Rep. 450; *Queen v. Dayton Coal and Iron Co.,* 95 Tenn. 458, 32 S. W. 460, 30 L. R. A. 92; *Osborne v. Van Dyke,* 113 Ia. 557, 85 N. W. 784, 54 L. R. A. 367.)

Complaint that the court erred in the giving and refusal of instructions, that the statute (R. S. 38-702) is unconstitutional, and that plaintiff is precluded from recovery because of violation of the Sunday law are not well taken.

The judgment is affirmed.

BURCH, J., dissenting.

DAWSON, J. (dissenting): I dissent from that part of this decision and judgment which is based on the construction now given to chapter 105 of the Session Laws of 1883, R. S. 38-701, 38-702.

The fathers of our republic believed that a well-regulated militia was necessary to the security of a free state and that the right of the people to keep and bear arms should never be infringed. Have we ceased to believe that doctrine? I refer to this not because it is

a provision of the federal constitution and restricts the power of congress over this subject, but because it is a basic principle of statecraft of deep concern to all who are clothed with authority and who feel their responsibility to hand on undiminished to future generations those liberties which are our proud American heritage.

From the landing of the Pilgrims in 1620 until the last Indian menace on the Kansas frontier in 1885, the rifle over the fireplace and the shotgun behind the door were imperatively necessary utensils of every rural American household. And it was just as imperative that the members of such household, old and young, should know how to handle them. And it was almost equally true that unless a man were trained in the use of the rifle and shotgun in his boyhood he seldom learned to use them. The American Civil War was largely fought by boys. Half the Union armies were made up of lads in their teens. When those armies were disbanded, so many thousand ex-Union soldiers came to Kansas that their political views and outlook on life and government gave form and tone to the genius of our Kansas institutions. They filled our public offices for a full generation. They constituted a majority of the legislature of 1883, when this statute was enacted, and a majority of all the legislatures of Kansas for a decade prior to and succeeding that time. Does anybody believe that while our western prairies were still sporadically subjected to Indian raids, while our pioneer homes were still shaded in gloom because of the tomahawk and scalping knife of Ogallalas, Cheyennes, Brule Sioux and other bloodthirsty savages who smeared our frontier with blood and tears as late as 1878 and 1879, a Kansas legislature would enact a law declaring it to be a crime for a father to intrust a rifle to his son of less than twenty-one years, and declaring it to be a crime for every youth less than twenty-one years of age to handle such a weapon? Yet that is exactly what this decision means when plainly spelled out in the Kansas language for everybody to read.

Yes, and it means more than that. It means that every parent in Kansas since the enactment of this statute in 1883 who has permitted his son under twenty-one to take the family shotgun or heirloom rifle and go rabbit hunting committed a crime in so doing and repeated that crime every time he did permit it. And the boy, too, committed a criminal act every time he used the gun or had it in his possession. Until the recent acceleration of urban population our people have been largely country bred and reared, and it is

conservative to say that nine out of every ten country-reared boys have been and still are permitted to use rifles and shotguns. Yet this decision in effect says all such doings are crimes!

It is only the indisputable fact that the legislature so intended which should constrain this court, after a lapse of forty-two years, to discover such an interpretation for this statute.

I think it unnecessary to supplement these general observations with a mere lawyer's argument that the decision is wrong, although it could readily be made. An application of the principle of *ejusdem generis* would make it perfectly clear what the lawmakers of 1883 were concerned with—the vice of permitting children to handle revolvers, toy pistols using explosives, dirks, slung shots and dangerous weapons of that character, *ejusdem generis*. A shotgun, a rifle, a pitchfork, a hatchet, is a dangerous weapon, of course, but neither is *ejusdem generis* with the sort of weapons denounced by the statute. But I place my dissent principally on the ground that the interpretation of the statute offends against the genius of Kansas and her hitherto free institutions, contemns her heroic history, and disdains the epics of her pioneers.

MASON, J. (dissenting): Courts have sometimes overworked the rule of *ejusdem generis*—that such words as "and others," following in a statute the enumeration of a number of articles, should by construction be expanded into the phrase "and others of the same kind." But the rule is still a sound one, especially in the interpretation of a penal act, where its application gives to the language of the legislature the meaning most probably intended when all considerations bearing on the matter have been duly weighed. Here the dangerous weapons specifically named in the statute have a quality in common, bearing a clear relation to the evil to be remedied. They all (with the exception of the toy pistol, which, as noted in the opinion of the court, was inserted by amendment after the bill had been introduced) are weapons primarily intended and used to inflict injury upon human beings, and generally speaking serving no worthy purpose but the quite exceptional one of self-defense. The shotgun, on the other hand, is habitually employed for such useful and ordinary purposes as protecting crops and procuring game. Moreover, it is such a common implement that if the lawmakers intended to include it in the prohibited list it is extremely unlikely they would have failed to mention it.