**UNITED STATES of America,
Appellee,**

v.

**RENE E., Juvenile Male, Defendant,
Appellant.**

No. 08–1974.

United States Court of Appeals,
First Circuit.

Heard June 5, 2009.

Decided Aug. 31, 2009.

J. Hilary Billings on brief for appellant.

Rene M. Bunker, Assistant United States Attorney, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

Before TORRUELLA, LIPEZ, and HOWARD, Circuit Judges.

LIPEZ, Circuit Judge.

Juvenile Rene E. ("appellant") was charged with possessing a handgun in violation of 18 U.S.C. § 922(x)(2)(A) and 18 U.S.C. § 5032, the charging provision of the Juvenile Delinquency Act. After his motions to dismiss and motion to suppress were denied, he entered a conditional guilty plea. On appeal, he raises constitutional challenges to 18 U.S.C. § 922(x)(2), arguing both that it violates his rights under the Second Amendment, as interpreted by the Supreme Court in *District of Columbia v. Heller*, —— U.S. ——, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and that it exceeds Congress's authority under the Commerce Clause. He also challenges the sentence he received under the Juvenile Delinquency Act, arguing that the district court erred in determining the maximum sentence to which a similarly situated adult would be subject under the United States Sentencing Guidelines.

We hold that 18 U.S.C. § 922(x)(2)(A) does not violate the Second Amendment, and we reaffirm our holding in *United States v. Cardoza*, 129 F.3d 6 (1st Cir. 1997), that section 922(x)(2)(A) does not

exceed Congress's Commerce Clause authority. Lastly, because appellant is no longer in detention or under juvenile supervision, we conclude that his sentencing challenge is moot. Therefore, we affirm.

## I.

### A. Factual Background

Because this appeal follows a conditional guilty plea, we state the facts as set forth in the unchallenged portions of the revised Presentence Investigation Report ("PSR").[1] *See United States v. Calderon–Pacheco*, 564 F.3d 55, 56 (1st Cir.2009).

On May 5, 2008, sources informed agents of the Central Maine Violent Crime Task Force that appellant was in possession of stolen property, drugs, a handgun, and a bullet-proof vest. Agents went to appellant's residence, where he lived with his mother and grandmother. His grandmother answered the door and escorted the agents to appellant's room. They knocked on the bedroom door and identified themselves. A short time later, appellant came out of his room. The agents immediately observed drug paraphernalia and stolen property that they had been told appellant possessed. The agents asked appellant if they could search his room, and he consented.

During the search, the agents discovered a box of hollow-point ammunition for a .38 caliber handgun, a plastic bag containing dried marijuana, and a silver-colored revolver with a wooden grip. At some point, appellant observed the agents' discovery of the handgun. When this happened, he fled the residence by jumping through the living room window. An agent who pursued him was injured when he fell from the window. Appellant es-

---

1. The district court did not state the facts during the juvenile disposition hearing. In its "Findings Affecting Sentencing," the court found the facts as set forth in the revised PSR.

caped. Sixteen days later, on May 21, 2008, he turned himself in and was arrested.

### B. Proceedings in the District Court

After his arrest, appellant's case was transferred from state authorities to the Bureau of Alcohol, Tobacco, Firearms, and Explosives.[2] Subsequently, on May 29, 2008, the government filed a Juvenile Information and supporting affidavit that charged appellant with an act of juvenile delinquency, namely, the knowing possession of a handgun in violation of 18 U.S.C. § 922(x)(2)(A) and 18 U.S.C. § 5032.[3] Appellant was seventeen at the time of the charged offense. On June 10, 2008, appellant filed concurrent motions to suppress the evidence acquired in the search of his bedroom and to dismiss the Information because 18 U.S.C. § 922(x)(2)(A) exceeded Congress's power under the Commerce Clause. The district court denied the motion to dismiss. At the suppression hearing on July 1, 2008, appellant again moved the court to dismiss the Information, this time in light of the Supreme Court's decision on June 26, 2008, in *District of Columbia v. Heller*, — U.S. —, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). The district court denied the motion.

Appellant's motion to suppress was denied at the close of the hearing. He then entered a conditional guilty plea, *see* Fed. R.Crim.P. 11(a)(2), reserving his rights to appeal the district court's adverse rulings on the motions to dismiss and his motion to suppress.

A PSR was subsequently prepared. The PSR explained that because appellant was being sentenced as a juvenile under the Juvenile Delinquency Act, the United States Sentencing Guidelines ("Sentencing Guidelines" or "Guidelines") did not apply. *See United States v. R.L.C.*, 503 U.S. 291, 307 n. 7, 112 S.Ct. 1329, 117 L.Ed.2d 559 (1992). However, a sentence under the Juvenile Delinquency Act may not exceed the sentence that a similarly situated adult would receive after application of the relevant Sentencing Guidelines. *See* 18 U.S.C. § 5037(c)(1)(B), (c)(2)(A)(ii), (c)(2)(B)(ii). Thus, the PSR explained, it was necessary to determine the maximum sentence a similarly situated adult would receive under the Sentencing Guidelines.

Appellant's offense, 18 U.S.C. § 922(x)(2), does not have a corresponding Guideline. Thus, the PSR calculated the base offense level by determining the "most analogous offense guideline." U.S.S.G. § 2X5.1. The PSR selected Guideline section 2K2.1(a)(7), a catchall provision for violations of firearms regulations, which has a base offense level of twelve. It applied a two-point reduction for acceptance of responsibility, *see id.* § 3E1.1(a), resulting in a total offense level of ten. Appellant's previous juvenile adjudications corresponded to a criminal history category of III. *See id.* ch. 5, pt. A. In light of these values, the PSR determined that the applicable Guideline range

---

**2.** The Bureau determined that the firearm seized from appellant's bedroom had been previously obtained in an illegal drug deal in Georgia, and exchanged hands twice before being acquired by appellant. However, there was no evidence that appellant was aware that the weapon derived from an out-of-state drug deal.

**3.** Pursuant to 18 U.S.C. § 5032, the United States Attorney for the District of Maine, on authority delegated by the United States Attorney General, filed a certification to proceed against appellant in federal court under the Juvenile Delinquency Act. The certification declared that appellant was a juvenile at the time of the offense, that the offense was in violation of 18 U.S.C. § 922(x), and that there was a substantial federal interest in the case to warrant the exercise of federal jurisdiction. *See* 18 U.S.C. § 5032.

for a similarly situated adult would be ten to twelve months' imprisonment. *Id.* § 5G1.1(c)(1).

Appellant objected to the PSR's conclusion that his juvenile sentence should be determined by calculating the maximum Guideline sentence for a "similarly situated adult," since appellant's offense, possession of a handgun by a juvenile, was one an adult could not commit. *See* 18 U.S.C. § 922(x)(2)(A). Appellant also objected to the determination that Guideline section 2K2.1(a)(7) was the most analogous offense Guideline, and argued that the offenses enumerated in Guideline section 2K2.1(a)(8) were more closely analogous.

A revised PSR was released, but no changes were made in response to these objections. At the juvenile disposition hearing, the district court rejected appellant's arguments and found that section 2K2.1(a)(7) was the most analogous offense Guideline. Pursuant to the sentencing provisions of the Juvenile Delinquency Act, the court sentenced appellant to six months' detention, followed by six months' juvenile supervision. *See* 18 U.S.C. § 5037.

This appeal followed. Appellant again asserts that 18 U.S.C. § 922(x)(2)(A) is unconstitutional, both because it violates the Second Amendment and because it exceeds Congress's power under the Commerce Clause. In addition, appellant argues that the district court erred in determining that Guideline section 2K2.1(a)(7) was the most analogous offense Guideline for purposes of calculating the maximum term of detention to which he could be sentenced.

## II.

We review constitutional challenges to a federal statute de novo. *United States v. Hussein,* 351 F.3d 9, 14 (1st Cir.2003).

### A. Second Amendment

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller,* the Supreme Court held that D.C. statutes banning the possession of handguns and requiring that all firearms in the home be kept inoperable violated the Second Amendment. 128 S.Ct. at 2821–22. The Court based its holding on a reading of the amendment's main clause, the "operative clause." *Id.* at 2789. The Court read the operative clause to "guarantee the individual right to possess and carry weapons in case of confrontation." *Id.* at 2797. Although not "codifi[ed]" in the amendment, this right included a right to "self-defense," which the Court described as "the *central component* of the right itself." *Id.* at 2801; *see also id.* at 2817 ("[T]he inherent right of self-defense has been central to the Second Amendment right."). Thus, the statutes in question were unconstitutional because they "prohibit[ ] . . . an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose [of self-defense]," and "make[ ] it impossible for citizens to use [firearms] for the core lawful purpose of self-defense." [4] *Id.* at 2817–18.

---

4. The *Heller* Court did not identify a standard of review for regulations that restrict Second Amendment rights, apart from rejecting rational basis review and "interest-balancing." *Id.* at 2817 n. 27, 2821. The D.C. regulations in question would fail, it said, "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 2817.

The *Heller* Court was careful to note that the rights guaranteed by the Second Amendment were "not unlimited." *Id.* at 2816. The Court identified limits deriving from various historical restrictions on possessing and carrying weapons. *Id.* ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). As examples of "longstanding" restrictions that were "presumptively lawful" under the Second Amendment, the Court listed: (1) laws prohibiting the carrying of concealed weapons, (2) laws prohibiting the possession of firearms by felons and the mentally ill, (3) laws prohibiting the carrying of firearms "in sensitive places such as schools and government buildings," (4) laws imposing conditions and qualifications on the commercial sale of arms, and (5) laws prohibiting the carrying of "dangerous and unusual weapons." *Id.* at 2816–17 & n. 26. These restrictions, as well as others similarly rooted in history, were left intact by the Second Amendment and by *Heller. Id.* at 2817 n. 26 ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.").

Appellant argues that *Heller* renders the federal ban on juvenile possession of handguns, 18 U.S.C. § 922(x)(2)(A), unconstitutional as applied to his case. He points out that, like the D.C. handgun ban invalidated in *Heller*, section 922(x)(2)(A) bans the mere possession of handguns, but suggests that it is "even more complete," because it applies "at all times, under all circumstances." Nor is it, he says, a "longstanding" prohibition, having been enacted into federal law in 1994. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, § 110201(a), 108 Stat. 1796, 2010 (1994) [hereinafter "Youth Handgun Safety Act"]. He argues that the interest in self-defense he had as a seventeen-year-old is just as strong as the interest of the adult respondent in *Heller.*

In response, the government argues that there are "longstanding" prohibitions on the juvenile possession of firearms, since juveniles did not serve in militias and were the sort of "potentially irresponsible persons" historically targeted by restrictive gun laws. It suggests that the ban in section 922(x) could survive even strict scrutiny, since the government's interest in regulating the illicit market in handguns is compelling and the ban narrowly tailored, containing an exception for self-defense. *See* 18 U.S.C. § 922(x)(3)(D).

We agree with the government that *Heller* does not render section 922(x)(2)(A) unconstitutional as applied to appellant. We rest our conclusion on the existence of a longstanding tradition of prohibiting juveniles from both receiving and possessing handguns, which we set forth below. We begin by examining the contemporary federal restrictions on firearm and handgun possession by juveniles, and then look to nineteenth-century state laws imposing similar restrictions, as the *Heller* Court did. *See Heller*, 128 S.Ct. at 2816–17 (citing nineteenth-century state laws as evidence of "longstanding" firearms restrictions); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L.Rev. 498, 503 (2004) (noting that the goal of examining early state gun regulations "is to shed light on the historical meaning of the right to bear arms in the Founding Era and early Republic and to see how the notion of arms bearing fits into the idea of a well regulated society"). Finally, we consider whether the Founders would have regarded prohibiting the juvenile posses-

sion of handguns as consistent with the Second Amendment right.

### 1. Congressional regulation of juvenile access to firearms

Congress has regulated various aspects of firearm sales and possession since the 1930's. *See United States v. Rybar,* 103 F.3d 273, 279–81 (3d Cir.1996) (reviewing the history of federal firearms legislation). The first major federal firearms legislation, the National Firearms Act of 1934, required all those engaged in the business of selling firearms and all firearms owners to register with the federal government, and subjected firearms sales to a special tax. *See id.* at 279 (citing Pub.L. No. 73–474, §§ 2–6, 48 Stat. 1236, 1237–38 (1934)). Congress first restricted the transfer of weapons on the basis of age in 1968. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, § 901(a)(6), 82 Stat. 197, 225–26 (1968) (finding that there "is a causal relationship between the easy availability of firearms other than a rifle or shotgun and juvenile and youthful criminal behavior, and that such firearms have been widely sold ... to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior"); *id.* § 922(b)(1) (prohibiting the sale of firearms to individuals less than twenty-one years old); Gun Control Act of 1968, Pub.L. No. 90–618, 82 Stat. 1213, 1218 (1968) (prohibiting the sale of rifles and shotguns to individuals less than eighteen years old). Congress's principal purpose in enacting these restrictions was "to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." S.Rep. No. 90–1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2113–14, *quoted in Huddleston v. United States,* 415 U.S. 814, 824, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974).

Handgun possession by juveniles, defined as those under eighteen years of age, was banned by federal law in 1994. *See* Youth Handgun Safety Act § 110201(a). As explained in the House Conference Report, the Youth Handgun Safety Act was aimed at preventing juvenile misuse of handguns and associated crime:

> [V]iolent criminals often start their criminal careers on streets where the ready availability of guns to young people results in the acceptability of their random use. Violent crime and the use of illicit drugs go hand-in-hand, and attempts to control one without controlling the other may be fruitless.... Inasmuch as illicit drug activity and related violent crime overflow State lines and national boundaries, the Congress has power, under the interstate commerce clause and other provisions of the Constitution, to enact measures to combat these problems. The Congress finds it necessary and appropriate to assist the States in controlling crime by stopping the commerce in handguns with juveniles nationwide, and allowing the possession of handguns by juveniles only when handguns are possessed and used for legitimate purposes under appropriate conditions.

H.R. Conf. Rep. No. 103–711, 1994 U.S.Code Cong. & Admin. News 1839, at p. 390–91 (1993).

Today, the ban on possession in section 922(x)(2)(A) is subject to several exceptions. *See* 18 U.S.C. § 922(x)(3). These exceptions permit juveniles to possess handguns for legitimate purposes, including hunting and national guard duty, as well as "in defense of the juvenile or other persons against an intruder into the residence of the juvenile or a residence in which the juvenile is an invited guest." *Id.* § 922(x)(3)(D). Thus, contrary to appellant's suggestion, the ban on juvenile possession of handguns is not "even more

complete" than the D.C. ban at issue in *Heller*, but contains important exceptions.[5]

### 2. State regulation of juvenile access to firearms

Long before this time, however, the states were engaged in regulating firearms, including their transfer to, and possession by, juveniles. Like the federal legislation that followed, state regulations sometimes reflected concerns that juveniles lacked the judgment necessary to safely possess deadly weapons, and that juvenile access to such weapons would increase crime. For example, in 1878, the Supreme Court of Tennessee suggested that a regulation criminalizing the sale of a pistol to a juvenile did not violate the Second Amendment and was wise public policy. *State v. Callicutt*, 69 Tenn. 714 (1878). The court wrote: "[W]e do not deem it necessary to do more than say that we regard the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *Id.*

During this period and soon after, a number of states enacted similar statutes prohibiting the transfer of deadly weapons—often expressly handguns—to juveniles. *See, e.g., McMillen v. Steele*, 275 Pa. 584, 119 A. 721, 721 (1923) ("The Act of June 10, 1881, § 1, makes any person, who shall knowingly and willfully sell or cause to be sold, to any person under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon, guilty of an offense." (internal quotation marks and citation omitted)); *State v. Quail*, 92 A. 859, 859 (Del.1914) (discussing indictment for

"knowingly sell[ing] a deadly weapon to a minor other than an ordinary pocket knife"); *Tankersly v. Commonwealth*, 9 S.W. 702, 702 (Ky.1888) (discussing indictment for "selling a deadly weapon to a minor"); *State v. Allen*, 94 Ind. 441 (1884) (discussing criminal information based on sale of "pistol" to minor); *Coleman v. State*, 32 Ala. 581 (1858) (citing act that "makes it a misdemeanor to sell, or give, or lend, to any male minor, a pistol" (internal quotation marks omitted)); *see also Spires v. Goldberg*, 26 Ga.App. 530, 106 S.E. 585, 586 (1921) (action asserting negligence per se based on sale of "pistol" to minor in violation of criminal statute); *Schmidt v. Capital Candy Co.*, 139 Minn. 378, 166 N.W. 502, 503 (1918) (similar).

At least some states criminalized the mere *possession* of handguns by juveniles. In two instances, courts upheld these regulations against state and federal constitutional challenges. In *Glenn v. State*, 10 Ga.App. 128, 72 S.E. 927 (1911), an intermediate Georgia court held that a 1910 ban on juvenile possession of handguns did not violate the Georgia Constitution. The court explained:

The next ground upon which it is insisted that the conviction in this case was illegal is that, if the act in question is construed to prohibit minors from having about the person a pistol or revolver, this construction would be in violation of ... the Constitution of Georgia.... [But] there are some rights which may be exercised by adults without harm to the state, but the same rights exercised by minors might injuriously affect in some way the public health, public safety, or public morality. Unquestionably, the possession of a pistol or revolver by

**5.** The self-defense exception to the ban on juvenile handgun possession closely resembles the exception added to the D.C. handgun ban after *Heller*. *See* D.C.Code § 7-2502.02 (now allowing the registration of "a pistol for use in self-defense within th[e] registrant's home").

a minor constitutes a menace to the peace of the public, and to the safety of the individuals constituting the public.[6] *Id.* at 928–29. Several years later, the Supreme Court of Illinois held that a Chicago ordinance that required individuals to obtain a permit to purchase concealable weapons, including handguns, and denied such permits to "all minors," did not violate either the Illinois or the United States Constitution. *Biffer v. City of Chicago*, 278 Ill. 562, 116 N.E. 182, 184–85 (1917); *cf. Parman v. Lemmon*, 119 Kan. 323, 244 P. 227, 228 (Kan.1926) (examining claim of negligence per se based on "chapter 105 of the Laws of 1883," which prohibited the possession of a dangerous weapon by "a minor or person of notoriously unsound mind").[7]

3. Evidence of the Founders' attitudes

The cases cited above evidence a view, from at least the Civil War period, that regulating juvenile access to handguns was permissible on public safety grounds and did not offend constitutional guarantees of the right to keep and bear arms. There is some evidence that the founding generation would have shared the view that public-safety-based limitations of juvenile possession of firearms were consistent with the right to keep and bear arms. In the parlance of the republican politics of the time, these limitations were sometimes expressed as efforts to disarm the "unvirtuous." Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L.Rev. 461, 480 (1995) ("One implication of this emphasis [among members of the Founders' generation] on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous (i.e.criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue." (internal quotation marks and citation omitted)).

In this sense, the federal ban on juvenile possession of handguns is part of a longstanding practice of prohibiting certain classes of individuals from possessing firearms—those whose possession poses a particular danger to the public. *See* Saul Cornell, *"Don't Know much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L.Rev. 657, 679 (2002) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right. Such a right was not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner."); Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 233 (1999) (quoting the "Dissent of the Minority," an Anti–Federalist publication written shortly after Pennsylvania ratified the Constitution, which recommended the amendment:

> The nature and extent of the obligation to render military service, is clearly ascertained by the principles of the public law. 'Every member of a society,' says *Vattel*, 'is obliged to serve and defend the State.... No person is naturally exempt from taking up arms in defence of the State.... They only are excepted who are incapable of handling arms, or supporting the fatigues of war. This is the reason why old men, children, and women are exempted.'
> *Id.*

---

6. Of course, Congress does not have the police power. Its jurisdiction to regulate the juvenile possession of handguns must rest on a different basis. *See infra* section II(B).

7. At least one state exempted juveniles from compulsory military service on the ground that they were unable to handle weapons. In *United States v. Blakeney*, 44 Va. (3 Gratt.) 405 (1847), the Supreme Court of Virginia explained:

"That the people have a right to bear arms for the defense of themselves and their own state ... and no law shall be passed for disarming the people or any of them, unless for crimes committed, or *real danger of public injury from individuals*" (emphasis added)); Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 Law & Contemp. Probs. 125, 130 (1986) (discussing the view of late-seventeenth century republicanism that "[t]he right to arms was to be limited to virtuous citizens only. Arms were 'never lodg'd in the hand of any who had not an Interest in preserving the publick Peace ....' ") (*quoting* J. Trenchard & W. Moyle, *An Argument Shewing, That a Standing Army Is Inconsistent with a Free Government, And Absolutely Destructive to the Constitution of the English Monarchy* 7 (1697)).

To be sure, there is an ongoing debate among historians about the extent to which the right to bear arms in the founding period turned on concerns about the possessor's "virtue," i.e., on a legislative judgment that possession of firearms by a certain class of individuals would pose a serious danger to the public. For a view contrary to Cornell's, see Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 155–56 (2007) (noting that "Parliament granted officers of the Crown the power to disarm any person they judged 'dangerous to the peace of the Kingdom,' "

but disputing that the states used their police power to regulate gun ownership and disarm dangerous citizens). Even Churchill, however, describes the Founders' view of the "right to keep arms" as "extend[ing] to all citizens, defined as free white *men* willing to swear allegiance as a test of their voluntary membership in the body politic." *Id.* at 166 (emphasis added). Thus, even Churchill appears to agree that the right to keep arms in the founding period did not extend to juveniles.

4. Conclusion

■ We wish to emphasize the circumscribed nature of our decision. We have addressed 18 U.S.C. § 922(x)(2)(A), a narrowly drawn federal prohibition on handgun possession by juveniles that contains exceptions for self- and other-defense in the home, national guard duty, and hunting, among other things. We have evaluated this prohibition in light of the state laws of the nineteenth century regulating juvenile access to handguns on the ground that their possession can pose a serious threat to public safety.[8] We have evaluated evidence that the founding generation would have regarded such laws as consistent with the right to keep and bear arms. Therefore, we have concluded that this law, with its narrow scope and its exceptions, does not offend the Second Amendment. *See Heller*, 128 S.Ct. at 2816–17.

**B. Commerce Clause**

The Commerce Clause gives Congress the power "[t]o regulate Commerce ...

---

**8.** We note that the Supreme Court has invoked similar concerns to circumscribe the constitutional rights of juveniles "against deprivations of liberty or property interests by the State." *Bellotti v. Baird*, 443 U.S. 622, 634, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) ("We have recognized three reasons justifying the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children;

their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." (emphasis added)); Katherine Hunt Federle, *The Second Amendment Rights of Children*, 89 Iowa L.Rev. 609, 668 (2004) ("[T]he Court has held repeatedly that the rights of minors are not commensurate with those of adults because of ... their inability to make informed and mature decisions....").

among the several States." U.S. Const. art. I, § 8, cl. 3. In *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court held that the ban on possessing handguns near schools in the Gun–Free School Zones Act of 1990 exceeded Congress's power under the Commerce Clause. *Id.* at 551, 115 S.Ct. 1624. In reaching this result, the Court described "three broad categories of activity" that Congress may regulate under the Commerce Clause:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce.

*Id.* at 558–59, 115 S.Ct. 1624 (internal citations omitted).

Discussing the third category, the Court observed that it had previously upheld laws regulating "intrastate economic activity" where that activity "substantially affected interstate commerce." *Id.* at 559, 115 S.Ct. 1624. It contrasted such regulations with the law at issue in *Lopez*, which, it observed, was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme would be undercut unless the intrastate activity were regulated." *Id.* at 561, 115 S.Ct. 1624. The causal connection between the regulated activity and interstate commerce was so attenuated that, if Congress had the power to regulate it, federal power would effectively be unlimited in scope. *Id.* at 564, 115 S.Ct. 1624.

Subsequently, in *United States v. Cardoza*, 129 F.3d 6 (1st Cir.1997), we upheld the Youth Handgun Safety Act against a *Lopez*-based challenge, concluding that the law fell within Congress's authority because it "regulates the national juvenile market in handguns by prohibiting certain intrastate activities." *Id.* at 11; *accord United States v. Michael R.*, 90 F.3d 340, 344–45 (9th Cir.1996). We reasoned that the ban on juvenile possession in 18 U.S.C. § 922(x)(2)(A) was, in the language of the Supreme Court, " 'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.' " *Cardoza*, 129 F.3d at 12 (quoting *Lopez*, 514 U.S. at 561, 115 S.Ct. 1624). Prohibiting possession, we said, "involves the suppression of the demand for such handguns.... The two prohibitions [possession and transfer] go hand in hand with one another. Invalidation of one half of the equation would likely have deleterious effects on the efficacy of the legislation." *Id.* Moreover, because a handgun "must come from somewhere, often out of state," Congress could have rationally concluded that the intrastate possession of a handgun by juveniles substantially affects the national handgun market. *Id.* at 13; *see also Michael R.*, 90 F.3d at 345 (discussing legislative findings on the effect of juvenile handgun possession on interstate commerce).

Appellant now asks us to alter our holding in *Cardoza*. He argues that the Supreme Court's decisions in *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), and *Gonzales v. Raich*, 545 U.S. 1, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005), changed the Commerce Clause jurisprudence such that our analysis in *Cardoza* is no longer correct. He also argues that the Supreme Court's decision in *Heller* "radically alters the analysis related to the scope of Congressional pow-

er under the Commerce Clause" by strengthening the individual interest in possessing a handgun. Lastly, he suggests that the regulation of juvenile handguns under section 922(x)(2)(A) violates the Tenth Amendment by regulating the conduct of children, a matter properly reserved to the states.

We decline appellant's request to alter our decision in *Cardoza*. First, we disagree that the Supreme Court's decision in *Heller* had any effect on the analysis we must undertake when evaluating the extent of Congress's power under the Commerce Clause. Under that analysis, "[f]irst, we must defer to a congressional finding that a regulated activity [substantially] affects interstate commerce, if there is any rational basis for such a finding." *Cardoza*, 129 F.3d at 11–12 (second alteration in original) (internal quotation marks, citation and footnote omitted). "Second, the only remaining question for judicial inquiry is whether the means chosen by [Congress] [are] reasonably adapted to the end permitted by the Constitution." *Id.* (alterations in original) (internal quotation marks and citation omitted); *accord United States v. Haney*, 264 F.3d 1161, 1167 (10th Cir.2001); *see Raich*, 545 U.S. at 19, 125 S.Ct. 2195; *Morrison*, 529 U.S. at 607, 120 S.Ct. 1740 (applying a "presumption of constitutionality"). Whether, in the exercise of its powers, Congress unconstitutionally infringed on a protected right is a distinct question, which we answered in section II(A).

■ Second, nothing in *Morrison* or *Raich* undermines our analysis of section 922(x)(2) in *Cardoza*. Both decisions reaffirmed Congress's power to regulate intrastate economic activity that substantially affects interstate commerce. *See Raich*, 545 U.S. at 17, 125 S.Ct. 2195; *Morrison*, 529 U.S. at 609, 120 S.Ct. 1740. As the

*Raich* Court described this power, Congress may regulate "purely intrastate activity ... if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in [a] commodity." 545 U.S. at 18, 125 S.Ct. 2195 (citing *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)). In particular, where a regulatory scheme is designed to "control the supply and demand" of a commodity in the interstate market, *id.* at 19, 125 S.Ct. 2195, a component regulation targeting intrastate conduct will be upheld if it is "an essential part of the larger regulatory scheme," *id.* at 27, 125 S.Ct. 2195; *accord United States v. Nascimento*, 491 F.3d 25, 53 (1st Cir. 2007) (Boudin, J., concurring) (quoting second passage).

*Raich* thus endorsed the reasoning we employed to uphold section 922(x)(2)(A) in *Cardoza*. Indeed, since our decision in *Cardoza*, courts have similarly characterized other firearms prohibition statutes as suppressing demand and therefore an essential part of regulating the national market in firearms. *See, e.g., United States v. Peters*, 403 F.3d 1263, 1277 (11th Cir.2005) (discussing the ban on felon possession of firearms, 18 U.S.C. § 922(g)); *Haney*, 264 F.3d at 1168–69 (upholding the ban on possessing machineguns, 18 U.S.C. § 922(o), as "an essential part of the federal scheme to regulate interstate commerce in dangerous weapons"); *United States v. Luna*, 165 F.3d 316, 321 (5th Cir.1999) (upholding the ban on possessing stolen firearms, 18 U.S.C. § 922(j), as an essential part of a larger regulation of economic activity); *cf. United States v. Rodia*, 194 F.3d 465, 475–76 (3d Cir.1999) (applying this reasoning to regulations banning the possession of child pornography).

We conclude that *Cardoza* remains good

law.[9]

## C. Sentencing

Our subject-matter jurisdiction extends only to cases or controversies. U.S. Const. art. III, § 2. The Supreme Court has held that to satisfy the case-or-controversy requirement, parties must "continue to have a personal stake in the outcome of the lawsuit." *Spencer v. Kemna*, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (internal quotation marks and citation omitted). In particular, "[a]n appellant must have 'suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" *United States v. Duclos*, 382 F.3d 62, 65 (1st Cir.2004) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)).

■ Here, appellant was sentenced to six months of detention followed by six months of juvenile supervision. In a letter filed with this court pursuant to Federal Rule of Appellate Procedure 28(j) just prior to oral argument, the government informed us that appellant has now served his term of detention and is no longer under federal supervision. On this basis, the government argues that the sentencing issue is moot.[10]

■ Once a term of incarceration has expired, "some concrete and continuing injury other than the now-ended incarceration (or parole)—some 'collateral consequence' of the conviction—[must exist] if

the suit is to be maintained." *Spencer*, 523 U.S. at 7, 118 S.Ct. 978. Appellant has identified several specific collateral consequences that he alleges flow from the district court's erroneous sentencing decision.

First, appellant argues that if the district court had correctly determined that the maximum term of detention to which appellant could be sentenced under the Juvenile Delinquency Act was six months, instead of a year, the district court "would most assuredly" have sentenced appellant to a shorter term of detention. Because the effect of previous convictions on his criminal history points is measured from his release from confinement under the Sentencing Guidelines, *see* U.S.S.G. §§ 4A1.1(e), 4A1.2(d)(2)(A), appellant argues that the length of his detention has collateral consequences. He also points out that there could be similar repercussions in the state system.

We have previously rejected this argument as "too speculative ... because 'it was contingent upon [appellant's] violating the law, being caught and convicted.'" *Duclos*, 382 F.3d at 67 (quoting *Spencer*, 523 U.S. at 15, 118 S.Ct. at 986–87); *accord United States v. Meyers*, 200 F.3d 715, 721–22 (10th Cir.2000); *United States v. Probber*, 170 F.3d 345, 348–49 (2d Cir. 1999). Moreover, appellant is required by law not to commit future crimes, and we see no reason to presume he cannot meet this requirement. *See United States v. Kissinger*, 309 F.3d 179, 182 (3d Cir.2002) (citing *Spencer*, 523 U.S. at 15, 118 S.Ct. 978).

9. Because we conclude that section 922(x)(2)(A) falls within Congress's Commerce Clause powers, it does not offend the Tenth Amendment. *United States v. Meade*, 175 F.3d 215, 224 (1st Cir.1999).

10. The Second Amendment and Commerce Clause challenges are not moot because those challenges attack the validity of appellant's conviction, not the length of his sentence. We normally presume that a challenge to a conviction is not moot, and the government has not argued otherwise. *See Spencer*, 523 U.S. at 8, 118 S.Ct. 978 ("In recent decades, we have been willing to presume that a wrongful criminal conviction has continuing collateral consequences....").

Second, appellant suggests that even if he is not suffering collateral consequences from his sentence, the issue of law he presents is one that is "capable of repetition while evading review." This exception to the mootness doctrine applies where " '(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again.' " *Ramirez v. Sánchez Ramos*, 438 F.3d 92, 100 (1st Cir. 2006) (alterations in original) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)).

Setting aside the question of whether the sentence appellant has challenged is "too short to be fully litigated prior to its cessation," we cannot agree that there is a "reasonable expectation that the same complaining party [will] be subjected to the same action again." Appellant was found delinquent and sentenced pursuant to the Juvenile Delinquency Act. *See* 18 U.S.C. § 5031–42. The act defines a "juvenile" as "a person who has not attained his eighteenth birthday," and "juvenile delinquency" as "the violation of a law of the United States committed by a person prior to his eighteenth birthday." *Id.* § 5031. Since appellant has already turned eighteen, future proceedings against him under the Juvenile Delinquency Act for violations of 922(x)(2) are permissible only if based on past conduct (in particular, conduct that occurred before his eighteenth birthday), and only if the proceedings and disposition are completed before appellant turns twenty-one. *Id.* Appellant has provided *no* reason to believe such proceedings will take place. *See Ramirez*, 438 F.3d at 101 ("Her allegations ... do not support a reasonable anticipation that she herself will be exposed to further Riot Act prosecutions."). We conclude that there is not a "reasonable expectation" that "the same

complaining party [will] be subjected to the same action again." *See id.* at 100.

Because we find that none of his arguments succeed, we conclude that the sentencing issue is moot and that we lack jurisdiction to consider it.

*Affirmed.*