No. 58,571

STATE OF KANSAS, *Appellee*, v. DAVID BOWERS, *Appellant*.

(721 P.2d 268)

Opinion filed June 13, 1986.

*Brad L. Keil*, legal intern, of Lawrence, argued the cause, and *Steven R. Zinn*, supervising attorney, Kansas Appellate Practice Clinic, of Lawrence, and *Ben-*

*jamin C. Wood*, chief appellate defender, of Topeka, were with him on the brief for the appellant.

*Randy M. Hendershot*, assistant district attorney, argued the cause, and *Robert T. Stephan*, attorney general, and *Gene M. Olander*, district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: The defendant, David Bowers, appeals his conviction by a Shawnee County, Kansas, jury of aggravated battery against a law enforcement officer (K.S.A. 21-3415). The issues on appeal are whether Doberman pinschers are deadly weapons and can inflict great bodily harm as required by K.S.A. 21-3414(c), whether K.S.A. 21-3414(c) is unconstitutionally vague, and whether the defendant was improperly sentenced to both imprisonment and restitution.

On July 29, 1984, after becoming intoxicated, the defendant caused an accident in the parking lot of a grocery store. He fled the scene in his truck at a high rate of speed and rammed from behind a family auto containing four people, demolishing the auto. Miraculously, no major injuries were suffered. Bowers then pulled the uninsured truck into the yard where he lived and started to repair the damage.

Shortly thereafter on the same day, three Topeka police officers went to the defendant's house in Topeka to investigate hit-and-run accidents involving a light blue Chevrolet pickup. The defendant lived at home with his mother, father, brother, and a boarder. Officer Scott Killingsworth was the first police officer to arrive. He found the defendant working on a truck which had fresh damage to the grill and bumper. When the officer approached the truck, the defendant went inside the house. Officer Killingsworth questioned the defendant's father about the truck. The father responded he didn't know anything about a hit-and-run accident and went inside the house.

The defendant appeared to Officer Killingsworth to be drunk. The defendant testified at trial he was drunk; he had consumed a half case of beer and had taken approximately ten pills of Valium that day.

The defendant came back outside and ordered the police off his property and returned inside. After Officer John Hatcher arrived, the defendant came outside holding a padlock in his hand. He told the officers he was going to lock the gate, let his

Doberman pinschers loose and sic them on the officers. He said his dogs were vicious and they would rip out the officers' "guts" and kill them. At that point, Officer Kent Cowhick arrived with an eyewitness who positively identified the defendant as the driver of the truck involved in a hit-and-run accident. Hatcher told the defendant he was under arrest and asked the defendant for identification. The defendant said it was inside. Uninvited, Officers Hatcher and Cowhick followed the defendant inside. Cowhick stood by the kitchen door where one Doberman pinscher came up to him and watched him. The defendant could not provide any identification. Officer Hatcher then took hold of the defendant to take him into custody. The defendant jerked away, and again Officer Hatcher took hold of him and tried to place handcuffs on him. Hatcher leaned the defendant over a couch and the two began struggling. What followed was a short free-for-all, complete with yelling and screaming.

Officer Cowhick testified that when Officer Hatcher landed on top of the defendant during the struggle, the dogs went over to the scuffle. One dog bit at Hatcher's boot and the other dog bit Hatcher's leg. Cowhick grabbed Hatcher's night stick, started hitting the dogs, and called for help. Cowhick testified he would hit a dog and it would "pop right out" at him. Cowhick didn't hear the defendant order the dogs to attack.

Officer Hatcher testified that as he was trying to handcuff the defendant, the defendant yelled twice at his parents who had one dog restrained, "Let the dogs loose, and get him." The dogs did not come over until the defendant gave that order. One dog grabbed Hatcher's boot and the other one his calf. The defendant's brother, James, entered the scuffle not trying to pull the dogs off Hatcher, but trying to pull Hatcher off the defendant. At one point, Hatcher pulled out his gun intending to shoot the dogs and then pointed the gun at the defendant. Hatcher, however, put his gun away due to the number of people in the room. Hatcher testified that while he had his gun out, the defendant was telling the dogs to attack.

Upon receiving Officer Cowhick's call for help, Officer Killingsworth entered the house where he saw Cowhick and Hatcher struggling with the defendant and the defendant's brother; Cowhick was also striking at two Doberman pinschers that were loose and lunging at the officers.

By the end of this free-for-all, Hatcher had received facial scratches, a laceration to the eye which required two stitches, and one dog bite in his calf that went through the muscle and down to the bone.

In a jury trial, the defendant was convicted of aggravated battery against a law enforcement officer and was sentenced to from five to twenty years along with restitution in the amount of $5,853.53.

The first issue defendant raises on appeal is two-fold: whether the trial court erred in denying his motion for judgment of acquittal made at the end of the trial because (1) there was no evidence Doberman pinschers are "deadly weapons" within K.S.A. 21-3414(c); and (2) there was no evidence the Doberman pinschers were used in a manner in which great bodily harm could have been inflicted.

The charge of aggravated battery against a law enforcement officer, pursuant to K.S.A. 21-3415, incorporates the elements of aggravated battery as set forth in K.S.A. 21-3414, as follows:

"Aggravated battery is the unlawful touching or application of force to the person of another with intent to injure that person or another and which either:
"(a) Inflicts great bodily harm upon him; or
"(b) Causes any disfigurement or dismemberment to or of his person; or
"(c) *Is done with a deadly weapon, or in any manner whereby great bodily harm, disfigurement, dismemberment, or death can be inflicted.*" (Emphasis added.)

The defendant was charged in the alternative under K.S.A. 21-3414(c): he unlawfully touched or applied force to Officer Hatcher, with the intent to injure Officer Hatcher, and that touching or force was done with a deadly weapon, two Doberman pinschers; or (2) that he unlawfully touched or applied force to Officer Hatcher, with the intent to injure Officer Hatcher, and that touching or force was done in a manner whereby great bodily harm, disfigurement, or death could have been inflicted upon Officer Hatcher. See PIK Crim. 2d 56.18, 56.19. We note the trial court also instructed the jury on the offense of simple battery against a law enforcement officer, which does not require the element of intent to injure necessary with aggravated battery against a law enforcement officer. The defendant was convicted on the aggravated charge.

A trial judge in passing on a motion for judgment of acquittal must determine whether upon the evidence, giving full play to

the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact therefrom, a reasonable mind, or rational trier of facts, might fairly conclude guilt beyond a reasonable doubt. *State v. McNaught*, 238 Kan. 567, 584, 713 P.2d 457 (1986). The trial court ruled the State had made a prima facie case. The two arguments made by the defendant, that the dogs were not deadly weapons, and were not used in a manner whereby great bodily harm could have been inflicted, were jury questions.

We will begin with the defendant's argument: Doberman pinschers are not deadly weapons.

The legislative history of K.S.A. 21-3414 does not aid this court in deciding whether the legislature intended a Doberman pinscher to fall within the category of a "deadly weapon." The general rules of statutory construction applicable to this case are stated in *State v. Cole*, 238 Kan. 370, 371-72, 710 P.2d 25 (1985), as follows:

"The fundamental rule of statutory construction is that the purpose and intent of the legislature governs when the intent can be ascertained from the statute. In construing statutes, the legislative intention is to be determined from a general consideration of the entire act. Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible. *State v. Dubish*, 236 Kan. 848, 853, 696 P.2d 969 (1985); *State v. Flummerfelt*, 235 Kan. 609, 612, 684 P.2d 363 (1984).

"Penal statutes must be strictly construed in favor of persons sought to be subjected to their operations. The rule of strict construction simply means that ordinary words are to be given their ordinary meaning. Such a statute should not be read to add that which is not readily found therein or to read out what as a matter of ordinary English language is in it. *State v. Zimmerman & Schmidt*, 233 Kan. 151, 155, 660 P.2d 960 (1983); *National Cooperative Refinery Ass'n v. Board of McPherson County Commr's*, 228 Kan. 595, 597, 618 P.2d 1176 (1980)."

In applying these rules to the statute in question we note that simple battery, a class B misdemeanor, is the unlawful touching or application of force to the person of another, done in a rude, insolent or angry manner. K.S.A. 21-3412. When that unlawful touching or force is done with the intent to injure and with a deadly weapon, the charge is elevated to aggravated battery which is a Class C felony. In *State v. Deutscher*, 225 Kan. 265, 269, 589 P.2d 620 (1979), this court recognized that the purpose of the aggravated assault statute, K.S.A. 21-3410, and the aggravated robbery statute, K.S.A. 21-3427, is to provide an enhanced

penalty when a deadly or dangerous weapon is used. The aggravated nature of a battery also results when the touching or force is done with a deadly weapon. K.S.A. 21-3414(c).

Second, ordinary words are to be given their ordinary meaning. The phrase to be construed is "deadly weapon." In *State v. Hanks*, 236 Kan. 524, 537, 694 P.2d 407 (1985), this court, in the context of an aggravated battery case, defined a deadly weapon as "an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury." We agree with the defendant that the subjective analysis used to determine whether a defendant is armed with a dangerous or deadly weapon in an aggravated robbery case is not applicable in the context of an aggravated battery case. That subjective test applies if the object is intended by the user to convince the victim that it is a dangerous weapon, and if the victim reasonably believes it is a dangerous weapon, then the object is a deadly weapon. See *State v. Davis*, 227 Kan. 174, 176, 605 P.2d 572 (1980); *State v. Robertson*, 225 Kan. 572, 574, 592 P.2d 460 (1979). In cases of aggravated battery, the victim's perceptions of the instrument used by the perpetrator are irrelevant.

Other jurisdictions have held dogs to be deadly or dangerous weapons. See Annot., 7 A.L.R. 4th 607, 608, where it is stated:

"Although there are few reported cases involving the use of dogs as dangerous weapons, and the relevant statutes differ widely among the jurisdictions, some general observations are possible. Since many state legislatures have not resolved the question whether a criminal defendant's use of a dog to intimidate his assault or robbery victim constitutes use of an offensive, dangerous, or deadly weapon, resolution of the issue has depended upon judicial construction of the more generally phrased statutes applicable. Where the relevant statute defining dangerous or offensive weapon broadly includes any instrumentality so constructed or used as to be likely to produce death or serious bodily harm, courts have extended the characterization offensive or dangerous weapon to include *dogs used to attack or intimidate the victim.*" (Emphasis added.)

In *Michael v. State*, 160 Ga. App. 48, 286 S.E. 2d 314 (1981), the defendant was convicted of aggravated assault. The defendant was driving behind the victim, Mr. Carlisle, and became enraged when Mr. Carlisle created a small traffic jam. The defendant got out of his truck with his Doberman pinscher. The defendant said he and his dog were going to kill Mr. Carlisle; the defendant kicked and hit Mr. Carlisle; the defendant either urged or permitted his dog to lunge at Mr. Carlisle, although the dog did not bite Mr. Carlisle. The appellate court ruled the trial

court properly found the defendant guilty of aggravated assault and stated, "Whether or not the Doberman pinscher actually bit Mr. Carlisle, the evidence in this case is sufficient to authorize the trial judge to find that, *as used,* appellant's hands and feet and his use of the dog were deadly weapons." 160 Ga. App. at 48. (Emphasis added.)

The defendant in *Commonwealth v. Tarrant,* 367 Mass. 411, 326 N.E.2d 710 (1975), entered the victim's apartment, accompanied by a medium-sized German shepherd. He also had what appeared to be a kitchen knife. The victim was in bed and the defendant ordered her not to move. As the defendant roamed the bedroom collecting articles and money, the dog also roamed the bedroom and at one point, got within a couple of feet of the victim's bed. The dog also came to the defendant when ordered to do so. The defendant was charged with armed robbery, and the appellate court ruled there was sufficient evidence for the jury to find the dog was a dangerous weapon within the armed robbery statute. The court stated that to determine whether an instrument, which is not designed to produce death or serious bodily injury, is a dangerous weapon depends upon whether the instrument *under the control of the accused* had apparent ability to inflict harm, whether the victim reasonably perceives it as having that capability, whether the instrument reasonably appears capable of inflicting bodily harm, and whether the accused intended, *by using the instrument,* to elicit fear to further the robbery.

In *People v. Kay,* 121 Mich. App. 438, 328 N.W. 2d 424 (1982), the defendant was charged with assault with a dangerous weapon. Two employees of a grocery store suspected the defendant had placed one or two steaks under his jacket. They followed the defendant as he ran to his van in the parking lot. Inside the van was the defendant's German shepherd. The defendant denied he took any merchandise, and the employees grabbed him. The defendant opened the door of his van and either called the dog by name or said "get'em." The dog lunged at the face of one of the employees and struck his glasses. The appellate court ruled a dog may be a dangerous weapon within the Michigan aggravated assault statute, stating the statute defining "dangerous weapon," is broad and includes any object which, *under the circumstances in which it is used,* is readily capable of causing death or serious physical injury.

*State in Interest of J.R.*, 165 N.J. Super. 346, 398 A.2d 150 (1979), involved a father and his six-year-old daughter who took their German shepherd to a park, letting their dog run free. After a while the defendant and his dog, entered the park. As the six-year-old girl was riding her bicycle on the basketball court, the defendant, from a distance of fifteen to twenty feet, said, "Sic'er. Sic'er." The defendant, a juvenile, was charged with delinquency based on assault with an offensive weapon. Based on the reasoning stated in *Commonwealth v. Tarrant*, 367 Mass. 411, the New Jersey appellate court upheld the trial court's ruling that under the facts, the defendant's dog was a deadly weapon.

Finally, the defendant in *People v. Torrez*, 86 Misc. 2d 369, 382 N.Y.S.2d 233 (1976), was charged with first-degree robbery, the equivalent of our aggravated robbery. The facts of the case are not stated in the opinion, but the defendant used a German shepherd in the course of a robbery. The New York statutes define "dangerous instrument" and "deadly weapon" differently. Basically, a deadly weapon is any loaded weapon from which a shot, readily capable of producing serious bodily injury, or death, may be discharged. A dangerous instrument includes any instrument which, *under the circumstances in which it is used,* is readily capable of causing death or serious bodily injury. The dog was found to be a dangerous instrument, but not a deadly weapon. The court stated:

"The Legislature in its definition of the term [dangerous instrument], clearly showed a recognition that a dog, so often properly characterized as man's best friend can under certain circumstances be used by one man as another man's worst enemy. . . . It is true that a diligent search for precedents has failed to disclose any previous holdings on this specific question. That may be because dogs as the faithful servants of man, are generally on the side of maintenance of law, not on the side of those who break the law. But here we have a charge that the defendant used a dog as a dangerous instrument in effectuating a robbery. Our lawmakers' definition of that term is clearly one which includes such misuse of a dog's allegiance to his master." 86 Misc. 2d at 372.

The holdings, in the above cases, that the dogs were deadly weapons or dangerous instruments turn on the fact in each particular case that the defendant, in some way, *used* the dogs, either to threaten or intimidate or further a robbery or assault. The definition of deadly weapon stated in *State v. Hanks*, 236

Kan. 524, also requires such a use: a deadly weapon is an instrument which, *from the manner in which it is used,* is calculated or likely to produce death or serious bodily injury.

It may be said a Doberman pinscher is not a deadly weapon per se, but an ordinary object *used* in a deadly manner is a deadly weapon within the meaning of K.S.A. 21-3414(c). Here the defendant was charged in the alternative under the above statute. The evidence discloses the Dobermans *were used* in a manner whereby great bodily harm could be inflicted. This was a fact question which the trial court properly submitted to the jury. *State v. Sanders,* 223 Kan. 550, 552, 575 P.2d 533 (1978).

The defendant admitted one of the dogs had previously bitten a person. The defendant's father testified the dogs have the capacity to do a lot of damage if an uninvited person enters the house. Here, the defendant threatened the officers with the dogs when they came into the yard. Later, in the house, when Officer Hatcher attempted to put handcuffs on the defendant there was evidence the defendant yelled twice at his parents, "Let the dogs loose, and get him." The dogs then made their attack, one biting Officer Hatcher in the calf of his leg.

On the record here presented, the trial court properly denied the defendant's motion for judgment of acquittal on the aggravated battery charge.

The defendant also argues the provision of K.S.A. 21-3414(c) which allows a conviction for aggravated battery when an unlawful touching is done "in any manner" whereby great bodily harm or death can be inflicted is unconstitutionally vague in that it delineates no standards for determining what conduct violates the statute.

The constitutional validity of a criminal statute was raised in *State v. Kee,* 238 Kan. 342, 351-52, 711 P.2d 746 (1985), where it was stated:

"The general rules of statutory construction were recently stated in *State v. Thompson,* 237 Kan. 562, 563, 701 P.2d 694 (1985):

" 'This court adheres to the proposition that the constitutionality of a statute is presumed, that all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. Moreover, it is the court's duty to uphold the statute under attack, if possible, rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. *City of Baxter Springs v. Bryant,* 226 Kan. 383, 598 P.2d 1051 (1979). We have stated that the fundamental rule of statutory construction, to which all others are subordinate, is that the

purpose and intent of the legislature governs when that intent can be ascertained from the statute.'

"The rules regarding vagueness and overbreadth are concisely stated in *State ex rel. Murray v. Palmgren*, 231 Kan. 524, 532, 646 P.2d 1091 (1982):

" ' "The test to determine whether a criminal statute is unconstitutionally void by reason of being vague and indefinite is whether its language conveys a sufficiently definite warning as to the conduct proscribed when measured by common understanding and practice. If a statute conveys this warning it is not void for vagueness. Conversely, a statute which either requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application is violative of due process. At its heart the test for vagueness is a commonsense determination of fundamental fairness." *State v. Kirby*, 222 Kan. 1, 4, 563 P.2d 408 (1977).'

And see also *State v. Cantrell*, 234 Kan. 426, 434-35, 673 P.2d 1147 (1983) [, *cert. denied* 105 S. Ct. 84 (1984)]; *J. G. Masonry, Inc. v. Department of Revenue*, 235 Kan. 497, Syl. ¶ 3, 680 P.2d 291 (1984).

"One further familiar rule which should be mentioned is that a statute may be constitutional as applied to one set of facts and unconstitutional as applied to another. See *State v. Smiley*, 65 Kan. 240, 69 Pac. 199 (1902), *aff'd* 196 U.S. 447, 49 L. Ed. 546, 25 S. Ct. 289 (1905); *U.S.D. No. 503 v. McKinney*, 236 Kan. 224, 231, Syl. ¶ 5, 689 P.2d 860 (1984). We must, therefore, consider the statute in context, not in isolation."

K.S.A. 21-3414 has faced constitutional challenges before. In *State v. Sanders*, 223 Kan. at 552, the phrase "great bodily harm" was found not to be unconstitutionally vague and indefinite. In *State v. Kleber*, 2 Kan. App. 2d 115, 119, 575 P.2d 900, *rev. denied* 225 Kan. 846 (1978), the Court of Appeals ruled the phrase "can be inflicted" was not unconstitutionally vague. The court stated:

"K.S.A. 21-3414(c) meets the constitutional test. The statute contains the following elements: (1) unlawful touching or application of force; (2) to the person of another; (3) with the intent to injure; and, (4) done with a deadly weapon or in any manner whereby great bodily harm or death can be inflicted. The elements are simple and certainly within common understanding and practice. The terms of the statute are not so vague that persons of common intelligence must necessarily guess at their meaning and differ as to their application. See *State v. Sanders*, 223 Kan. 550."

The phrase "in any manner" is not vague. The ordinary meaning of "manner" is a mode, a method, the way of effecting a result. *Getty v. Holcomb*, 79 Kan. 224, 227, 99 Pac. 218 (1908). See the definition for "manner" given in 55 C.J.S., pp. 663-65. Here, in the context of the aggravated battery statute, the method in which the unlawful touching or application of force is done must be one that could inflict great bodily harm, disfigurement,

dismemberment or death. This language, "in any manner," conveys a sufficiently definite warning as to the conduct proscribed.

The final issue on appeal is whether the trial court imposed an illegal sentence. The defendant's original sentence of ten to twenty years on the charge of aggravated battery against a law enforcement officer was modified to from five to twenty years. The journal entry ordering sentencing stated:

"[I]t is the order of the Court that count 1 in which the defendant was found guilty of Aggravated Battery on a Law Enforcement Officer shall be modified so that the defendant's minimum sentence is not more than five (5) years and the defendant's maximum sentence is not more than twenty (20) years in the care, custody and control of the Secretary of Corrections of Kansas. All other matters of the defendant's original sentence remain the same with no modification. It is the order of the Court that the defendant shall be responsible for restitution in the amount of $5,853.53, the said sum being payable and owing to the Kansas Claims Service of Topeka, Inc., 1829 Gage, P. O. Box 4792, Topeka, Kansas, 66604. It is the order of the Court that said sum includes a $100.00 deductible amount which shall be made payable to the Ronald Artzer family when said money is oversee [sic] by the Kansas Claims Service."

The defendant argues he was sentenced to imprisonment *and* ordered to pay immediate restitution in violation of K.S.A. 1985 Supp. 21-4603(2). The State argues the trial court did not order the defendant to pay immediate restitution. The State argues the trial court was informing the Kansas Adult Authority of the amount of money the defendant owed, pursuant to K.S.A. 1984 Supp. 22-3717(j), in the event the defendant was granted parole.

A trial court may not sentence a defendant to imprisonment in an institution and also require the defendant to pay immediate restitution. See *State v. McNaught,* 238 Kan. 567, 589, 713 P.2d 457 (1986); *State v. Hicks,* 11 Kan. App. 2d 76, 89, 714 P.2d 105 (1986); *State v. Chilcote,* 7 Kan. App. 2d 685, 689-90, 647 P.2d 1349, *rev. denied* 231 Kan. 801 (1982). The trial court may order restitution only if a defendant's sentence is suspended or if a defendant is granted probation. K.S.A. 1985 Supp. 21-4603(2)(c), (d). The journal entry of the trial court, however, may specify the manner and amount of restitution the defendant owes, said information to be used by the Kansas Adult Authority in the event the authority orders the parole of the defendant. K.S.A. 1984 Supp. 22-3717(j), in effect at the time the defendant was originally sentenced, read:

"Whenever the Kansas adult authority orders the parole of an inmate, the authority, unless it finds compelling circumstances which would render a plan of

reparation or restitution unworkable, shall order as a condition of parole that the parolee make reparation or restitution to the aggrieved party for the damage or loss caused by the parolee's crime, *in an amount and manner specified in the journal entry of the court that sentenced the inmate or, if not specified in the journal entry, in an amount and manner determined by the adult authority."* (Emphasis added.)

This statute has been amended. See K.S.A. 1985 Supp. 22-3717(k), which was in effect when the defendant's sentence was modified. The above language, however, was not altered.

In the instant case, the defendant was ordered to make restitution to the Kansas Claims Service of Topeka, Inc., an organization that, once paid, reimburses insurance companies who have paid claims which have been made by its insureds. While the record is silent as to how the court arrived at the amount of $5,853.53, that amount appears to be the total the defendant's victims were paid by their insurance companies for damage caused by the defendant.

After carefully reviewing the trial court's journal entry and the entire record, we conclude the trial court's order of restitution in the amount of $5,853.53 was not advisory pursuant to K.S.A. 1985 Supp. 22-3717(k); rather, immediate restitution was ordered rendering the defendant's sentence illegal. If the sentencing court chooses to set restitution, it should clearly specify in the journal entry that the amount and manner of restitution being ordered is not immediate, but said information is being provided for the benefit of the Kansas Adult Authority.

The judgment of the lower court upholding the defendant's conviction of aggravated battery against a law enforcement officer is affirmed, and the case is remanded for proper sentencing.

MILLER, J., concurring: The defendant in this case was charged and tried on alternative theories—that the battery was committed with a deadly weapon (two Doberman pinscher dogs), or in a manner whereby great bodily harm or death could have been inflicted. I agree that, under the facts of this case, the latter theory was established by the evidence. I disagree, however, that the dogs were deadly weapons within the meaning of K.S.A. 21-3414.

In *Parman v. Lemmon,* 119 Kan. 323, 244 Pac. 227 (1925), the court considered R. S. 1921, 38-701, which statute made it a misdemeanor to furnish a minor with a pistol, revolver, "or other dangerous weapons." The court, with Justices Burch, Dawson

and Mason dissenting, held that a shotgun was included within the phrase "or other dangerous weapons" as used in that statute. The following year, upon rehearing, with Chief Justice Johnston and Justice Harvey dissenting, the court reversed its original opinion and held that it was not the intention of the legislature to include shotguns within the words "or other dangerous weapons" as contained in the legislative act. *Parman v. Lemmon*, 120 Kan. 370, 244 Pac. 232 (1926).

Webster's Third New International Dictionary 2589 (rev. 1964) defines weapon as: "[A]n instrument of offensive or defensive combat: something to fight with: something (as a club, sword, gun, or grenade) used in destroying, defeating or physically injuring an enemy . . . ." Firearms, knives and clubs first come to mind as weapons. Also, items used with the intent of inflicting bodily harm—baseball bats, axes, hatchets, sticks, and stones can be used as weapons. A person's fists or feet can constitute weapons. The common connotation of the word "weapon" is that of an inanimate object physically wielded or used by a person offensively or defensively. I do not believe that the legislature was speaking of dogs, cats or horses when it used the words "deadly weapon." I respectfully disagree with that portion of the opinion construing "deadly weapon" to include dogs.

However, defendant's use of the dogs under the facts of this case resulted in the application of force to the person of the victim with the intent to injure him in a manner whereby great bodily harm could be inflicted. Therefore, I concur in the affirmance of the conviction.

PRAGER, J., joins the foregoing concurring opinion.