(249 P.3d 15)
No. 102,715

STATE OF KANSAS, *Appellee*, v. ELTON SIMMONS, *Appellant*.

Opinion filed March 4, 2011.

*Shawn E. Minihan*, of Kansas Appellate Defender Office, for appellant.

*Boyd K. Isherwood*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, for appellee.

Before MCANANY, P.J., LEBEN and ATCHESON, JJ.

ATCHESON, J.: Defendant Elton Simmons appeals his convictions for aggravated battery and two misdemeanors in Sedgwick County District Court arising from a 2006 blowup with his then girlfriend. He also disputes both an assessment of fees against him for the work of his appointed defense counsel and the treatment of his earlier criminal convictions for sentencing purposes. We reverse the aggravated battery conviction and remand for a new trial because the lower court declined to instruct the jury on simple battery as a lesser included offense. We also reverse the fee assessment and remand for further hearing. We otherwise deny the points Simmons has presented on appeal.

## FACTUAL AND PROCEDURAL OVERVIEW

Defendant Simmons and Camille Terry described themselves as

boyfriend and girlfriend. Their relationship, however, was often discordant. The discord turned violent on June 12, 2006. Simmons approached Terry near her car, which was parked outside her residence in Wichita. He demanded that Terry return $20 he had given her earlier and wanted clothing of his from the trunk of the car. Terry told Simmons she no longer had the money but opened the trunk for him. As Terry was pawing through the clothing, he grabbed Terry's cell phone and told her she could have it back if she returned the $20.

Terry slapped Simmons. And he says she tried to kick him. Simmons punched Terry twice in the face. At trial, Simmons testified he was trying to defend himself, as Terry assaulted him. Terry denied she did anything to Simmons after slapping him. In that go-around, Terry's cell phone wound up broken. Terry had a black eye and a loosened tooth from the punches.

Terry went into the home of Tonya Jackson, a neighbor, to use her telephone. Simmons followed and accused Terry of calling the police. He stormed out, saying he was going to take Terry's car. A few minutes later, Simmons came back into Jackson's living room and again punched Terry. At trial, Terry was not specifically asked how many times Simmons struck her. A Wichita police officer who took a statement from Terry that day testified that she said Simmons punched her once or twice in the face. Jackson testified she saw Simmons strike Terry once. But she said she walked into the living room in the middle of the commotion, so Simmons could have hit Terry before then. Simmons again left, driving off in Terry's car. At trial, Simmons simply denied he struck Terry inside the house.

Terry was treated at a local hospital for a broken nose and a cut to the forehead that needed nine stitches. Terry told the jury she received both those injuries during the second confrontation with Simmons—the one inside Jackson's house. In late October 2006, Terry had surgery to realign her nasal passages because she had trouble breathing easily after Simmons punched her.

Simmons was arrested on June 15, 2006, in southeast Kansas. He had Terry's car.

Simmons was returned to Sedgwick County where he was charged with: (1) misdemeanor or simple battery for punching Terry outside; (2) misdemeanor theft for taking Terry's cell phone; (3) misdemeanor criminal damage to property for breaking Terry's cell phone; (4) felony theft for stealing Terry's car; and (5) felony or aggravated battery for punching Terry inside the Jackson home. Simmons was unable to post bond and remained in custody following his arrest. A Sedgwick County jury heard the case over 2 days in December 2006. The jury acquitted Simmons of both charges regarding the cell phone, convicted him of misdemeanor theft for taking the car, convicted him of simple battery for punching Terry outside, and convicted him of a lesser degree of aggravated battery for punching Terry inside the Jackson home. Simmons has timely appealed.

We supplement the factual and procedural history of the case as necessary for a full discussion of each of the appellate issues.

### IMPROPER QUESTION BY PROSECUTOR

Simmons contends that a question the prosecutor posed to Terry tainted the jury trial and requires reversal of all of the convictions. During the direct examination of Terry, the prosecutor asked, "Have you ever been to see him [Simmons] since he's been in custody?" She said she had not. Simmons' lawyer objected and asked to approach the bench. The trial judge denied that request and, without formally ruling on the objection, told the prosecutor, "[L]et's just move on from here."

At the next break in the trial testimony and outside the presence of the jury, defense counsel moved for a mistrial on the grounds that the question "clearly show[ed]" Simmons had been and continued to be in custody "because of this case." The prosecutor indicated that in asking the question she wanted to get at the lack of communication between Terry and Simmons after the events of June 12; she agreed the question could have been phrased more adroitly. The trial judge denied the request for a mistrial. He characterized the question as an "innocuous reference" to Simmons' being in custody and noted that the prosecutor had made no other

remarks to that effect. Simmons cites no other references made in the presence of the jury to his being a pretrial detainee.

On appeal, Simmons primarily seems to argue that the question implied to the jury that he had been incarcerated in the past and, thus, had criminal convictions. First, that is different from the basis for the objection and request for a mistrial lodged in the lower court. We typically decline to entertain arguments on appeal that have not been presented below. *State v. Warledo*, 286 Kan. 927, 938, 190 P.3d 937 (2008) ("Generally, issues not raised before the trial court cannot be raised on appeal."); *State v. Engelhardt*, 280 Kan. 113, 127, 119 P.3d 1148 (2005) (A party may not voice an objection on one ground at trial and urge a different ground as error on appeal.). We also fail to see how the question reasonably might be understood to refer to Simmons' having been in prison on some past offense. The tenor of the question and the surrounding testimony plainly dealt with communications between Terry and Simmons after June 12. (Just before posing the disputed question, the prosecutor had been asking Terry about telephone calls Simmons made to her following the altercation.)

On the assumption that Simmons continues to press the objection he voiced below as an alternative ground here (though his brief is less than plain), we address that argument as well. Reference to a criminal defendant's status as a pretrial detainee in front of the jury is improper absent some particularized circumstance making it independently relevant. *United States v. Lonedog*, 929 F.2d 568, 570-71 (10th Cir. 1991) (finding question regarding defendant's status as a pretrial detainee to be objectionable). For example, if the prosecution called a witness who claimed to have heard the defendant make incriminating statements while both were pretrial detainees, the fact of the detention would necessarily be relevant. But status as a pretrial detainee in and of itself has no particular bearing on a defendant's guilt or innocence and, as a result, is not a matter for the jury's consideration.

The United States Supreme Court has recognized that requiring detainees to appear for trial dressed in jail uniforms implicates and compromises a criminal defendant's constitutional rights to a fair trial. *Estelle v. Williams*, 425 U.S. 501, 512-13, 96 S. Ct. 1691, 48

L. Ed. 2d 126 (1976). The Court found that practice to be so plainly inconsistent with due process it did not discuss the specific reasons for condemning the practice. 425 U.S. at 504-05. The Court noted that identifying a criminal defendant as a pretrial detainee served no particular governmental purpose and effectively discriminated against those defendants unable to make bail. 425 U.S. at 505-06. A prosecutor's reference to a defendant's being in custody, while less corrosive, differs in degree rather than in kind from requiring a defendant to appear in a jail uniform. From either, jurors might infer a defendant had been unable to post bail or had been denied bail altogether because of the seriousness of the crime charged or an extended criminal history. Trial courts should take reasonable steps to avoid fostering those extraneous and impermissible impressions.

In considering whether a prosecutor's questioning of a witness constitutes error, the appellate courts apply the same methodology used to evaluate improper statements in a closing argument. See *State v. Tosh*, 278 Kan. 83, 93-94, 91 P.3d 1204 (2004). To measure the propriety of a prosecutor's statements in front of a jury, the appellate courts engage a two-tiered review, asking first whether the given statement was, in fact, improper and, if so, whether it sufficiently contaminated the trial to require reversal of the conviction. *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009). If a remark or a question and answer are improper, the appellate court must weigh three factors in evaluating the prejudicial impact:

" '(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmless error tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman v. California*, 386 U.S. 18, [22,] 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) [conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial], have been met. [Citations omitted.]' [Citation omitted.]" 288 Kan. at 323.

As we have pointed out, the prosecutor's question was improper. We, therefore, move to the second level of analysis. We cannot

characterize the question as reflecting gross or flagrant misconduct or as demonstrating ill will. The question was, admittedly, badly phrased. It could have been worded to avoid any reference to Simmons' status as a pretrial detainee and still elicited the desired information from Terry. At the same time, we recognize the question and answer process that infuses a trial unfolds without the precise scripting of theater or cinema. Misshapen questions and surprise answers are the inevitable byproduct. This looks to be an unfortunate example of that fluidity and nothing more. The prosecutor did not use Simmons' status as theme of her case and, indeed, made no other reference to his being a pretrial detainee. We fail to see how this single question in the 2-day trial would have adversely influenced the jury. There is no objective evidence to suggest so, especially given the split verdict acquitting Simmons of some charges and convicting him of lesser offenses on others.

We find the error to be harmless. Other courts have come to like conclusions in comparable circumstances. *United States v. Atencio*, 435 F.3d 1222, 1236-37 (10th Cir. 2006) (reference in prosecutor's closing argument to defendant having been in jail subject to harmless error analysis and insufficient to warrant reversal of conviction); *Lonedog*, 929 F.2d at 570-71 (same; although prosecutor's question was objectionable, the error was harmless, especially absent an objection); see *State v. Hall*, 220 Kan. 712, 715, 556 P.2d 413 (1976) (The Supreme Court reviews a defendant's brief appearance before a jury venire in a prison uniform for harmless error where he was then permitted to appear throughout the trial in civilian clothing and concludes the defendant incurred no material prejudice.).

## FAILURE TO INSTRUCT ON BATTERY AS LESSER INCLUDED OFFENSE

Simmons challenges his conviction for aggravated battery on the grounds the trial court failed to instruct the jury on the lesser included offense of simple battery, a misdemeanor. For reasons we outline below, we find the point well taken and reverse the conviction.

Simmons made a sufficient and timely request for an instruction on simple battery. The trial court and counsel held an instruction conference during the late morning on the last day of trial and then broke for lunch. During the conference itself, Simmons did not ask for the instruction. After lunch and before the jury had been charged, Simmons made the request on the record as the trial court discussed the final draft of the instructions and the verdict form with counsel. The prosecutor agreed that an instruction on simple battery should be given as a lesser included offense. The trial court declined to honor that joint request because the instructions had already been prepared and told counsel, "we have to get going." We view the request as timely, since there was an adequate opportunity to revise the instructions before charging the jury. This was not a party's request for a supplemental instruction after the charge and argument, something that might pose additional considerations. See K.S.A. 22-3420(3); *State v. Lovely*, 237 Kan. 838, 845, 703 P.2d 828 (1985) (In response to a request from the jury, the trial court has the discretion to provide supplemental instructions.).

Instructing a jury on aggravated battery is hardly a ministerial task. The crime, as outlined in K.S.A. 21-3414, encompasses a series of related, though distinct, felony offenses carrying different levels of punishment. The statute outlines the following offenses:

• intentionally causing "great bodily harm" or disfigurement to another person, a severity level 4 person felony;

• intentionally causing "bodily harm" to another by use of a deadly weapon or "in a manner whereby great bodily harm, disfigurement or death can be inflicted," a severity level 7 person felony;

• intentionally causing "physical contact" with another person by use of a deadly weapon when done in a rude, insulting, or angry manner or "in a manner whereby great bodily harm, disfigurement or death can be inflicted," a severity level 7 person felony;

• recklessly causing "great bodily harm" or disfigurement to another person, a severity level 5 person felony; and

• recklessly causing "bodily harm" to another by use of a deadly weapon or "in a manner whereby great bodily harm, disfigurement or death can be inflicted," a severity level 8 person felony.

·· The crime of aggravated battery, thus, entails differing elements and punishments depending on the defendant's intent (intentional versus reckless action); the means (deadly weapon or manner with the potential for great bodily harm, disfigurement, or death); and the degree of injury to the victim (great bodily harm, bodily harm, or mere physical contact). Depending on the facts of a given case, the permutations can be both numerous and challenging. The statutory definitions effectively create several lesser included offenses within the general rubric of aggravated battery.

· ·In addition, simple or misdemeanor battery commonly must be considered as a possible lesser included offense. As provided in K.S.A. 21-3412(a)(1), (2), battery is either "[i]ntentionally causing physical contact with another person when done in a rude, insulting, or angry manner" or "intentionally or recklessly causing bodily harm to another person." As with the levels of aggravated battery, the distinction between the misdemeanor and felony offenses may turn on the degree of harm or the means used to inflict the harm. If the victim suffers "great bodily harm," the crime necessarily is a felony. Likewise, if the defendant uses a deadly weapon or acts in a way that *could* cause great bodily harm, the crime is a felony even though the victim may have minor or no physical injuries.

A trial court is obligated to instruct on any lesser included offense on which a jury might reasonably return a verdict considering the evidence in a light most favorable to the defendant. See K.S.A. 22-3414(3); *State v. Simmons*, 282 Kan. 728, 741-42, 148 P.3d 525 (2006). An instruction should be given even if the evidence supporting that lesser offense is "weak or inconclusive." *State v. Nelson*, 291 Kan. 475, Syl. ¶ 1, 243 P.3d 343 (2010). ·

When a defendant has made a sufficient request for an instruction on a lesser included offense, as Simmons has here, we treat the failure to give the instruction as a question of law, since no credibility determinations or other weighing of evidence figures into the analysis. Our review, therefore, is plenary, and we owe no particular deference to the trial court's decision. See *State v. Gallegos*, 286 Kan. 869, 873, 190 P.3d 226 (2008). Here, the trial court never really passed on the legal propriety of giving an instruction on simple battery as a lesser included offense of the aggravated

battery charge. But, instead, the trial court rejected the request simply in the name of judicial efficiency.

The State charged Simmons with a severity level 4 aggravated battery of Terry based on the encounter in the Jackson home on the theory he caused her "great bodily harm." As we noted, Simmons denied that he confronted Terry at all inside the house. Assuming the jury did not believe the disclaimer, the evidence essentially showed that Simmons struck Terry once or twice with his closed fist. Terry suffered a cut on her forehead requiring nine stitches to close and a broken nose. She was treated and released at a Wichita hospital. Some 4 months later, Terry underwent a 45-minute surgical procedure to realign her nasal passages because she had experienced some difficulty breathing normally as a result of the injury.

The trial court did instruct the jury on a range of aggravated battery offenses: (1) Simmons intentionally caused "great bodily harm or disfigurement" to Terry (the severity level 4 offense the State charged); (2) Simmons intentionally caused "bodily harm" to Terry "in a manner whereby great bodily harm, disfigurement or death can be inflicted"; (3) Simmons intentionally caused "physical contact" with Terry in a rude, insulting, or angry manner and "in a manner whereby great bodily harm, disfigurement or death can be inflicted"; (4) Simmons recklessly caused "great bodily harm or disfigurement" to Terry; and (5) Simmons recklessly caused "bodily harm" to Terry "in a manner whereby great bodily harm, disfigurement or death can be inflicted." The trial court properly excluded any instructions dependent upon the use of a deadly weapon—under no theory or evidence would that have been appropriate. The jury, as noted, acquitted Simmons of severity level 4 aggravated battery and convicted him of the severity level 7 offense of intentionally causing "bodily harm" to Terry in a manner whereby great bodily harm, disfigurement, or death could be inflicted.

In considering whether the trial court should have given an instruction on simple battery as a lesser included offense, we must determine if a jury reasonably could have returned a verdict on that charge. That is, could a jury have found the elements of simple

battery to the exclusion of the elements of aggravated battery? In this case, we believe so. A jury would have to find both that Terry suffered bodily harm rather than great bodily harm and that the harm was not inflicted in a manner that could have resulted in great bodily harm, disfigurement, or death. Commonly, each of those determinations presents a fact question for a given jury to resolve. *State v. Green*, 280 Kan. 758, 765, 127 P.3d 241, *cert. denied* 549 U.S. 913 (2006) (great bodily harm); *State v. Bowers*, 239 Kan. 417, 425, 721 P.2d 268 (1986) (manner whereby great bodily harm could be done); *State v. Dubish*, 234 Kan. 708, Syl. ¶ 5, 675 P.2d 877 (1984) (great bodily harm). Only in particularly extreme circumstances have the Kansas courts favored precluding a jury from considering those issues.

The divide between "bodily harm" and "great bodily harm" as used in the statutes outlining battery and aggravated battery is not especially clear cut. The Kansas courts have described "great bodily harm" as requiring something "more than slight, trivial, minor, or moderate harm . . . which is likely to be sustained by simple battery." *Green*, 280 Kan. at 765; *State v. Morton*, 38 Kan. App. 2d 967, Syl. ¶ 2, 174 P.3d 904, *rev. denied* 286 Kan. 1184 (2008). That description is, perhaps, more circular than predictive. And the difference may turn on quite specific facts of a given case. *Green*, 280 Kan. at 765. As a result, the characterization of particular injuries as bodily harm or great bodily harm routinely has been left to the collective wisdom of the jurors. 280 Kan. at 765 (Although noting that gunshot wounds, rape, and sodomy have been treated as great bodily harm as a matter of law, the court recognizes "the question of whether an injury constitutes great bodily harm is . . . for the jury to decide."); *Morton*, 38 Kan. App. 2d 967, Syl. ¶ 2; see *State v. Valentine*, 260 Kan. 431, 435, 921 P.2d 770 (1996), *overruled on other grounds State v. Brice*, 276 Kan. 758, 773-74, 80 P.3d 1113 (2003) ("There may be instances where a bullet wound is not 'great' bodily harm when, for example, it grazes the skin.").

The pertinent statutes contain no definitions or descriptive terminology shedding any light on the distinction between bodily harm and great bodily harm. And there is no pattern jury (PIK) instruction on the point. Again, that suggests the importance the

legislature and the PIK authors place on the reasoned judgment of a jury in weighing the facts of a given case to arrive at those determinations in the context of an aggravated battery prosecution.

Whether sufficient force has been applied in a way creating a "manner whereby great bodily harm . . . can be inflicted" also typically presents a question for the jury to resolve. *Bowers*, 239 Kan. at 425. Although the aggravated battery statute has been revised and reworded since *Bowers*, the operative language on the manner of the physical contact remains intact. The Kansas Supreme Court has presumed the issue remains a jury question under the current statute. See *State v. Murdock*, 286 Kan. 661, 668-69, 187 P.3d 1267 (2007). The Court of Appeals has recognized the issue as one for the jury. *State v. Curreri*, 42 Kan. App. 2d 460, Syl. ¶ 4, 213 P.3d 1084 (2009), *rev. denied* 290 Kan. 1097 (2010) ("Whether an injury could cause great bodily harm under K.S.A. 21-3414(a)(1)(B) is a question for the jury."); *State v. Quinones*, No. 93,848, unpublished opinion filed April 14, 2006, slip op. at 5. That determination is similarly dependent upon an evaluation of what sort of injuries might be considered as great bodily harm. Having arrived at an understanding of what amounts to great bodily harm, a jury could then determine if the actions of a defendant were such that they might inflict that degree of injury.

A jury would presumably go through a similar analysis as to "disfigurement" by developing a working understanding of what that term encompasses and then deciding if a defendant's actions could have caused disfigurement. The "death" component of the "manner whereby" means of proving aggravated battery presents less of an analytical challenge. There isn't the same ambiguity in defining "death," placing the focus largely on whether a defendant's actions amount to potentially lethal force, *i.e.*, a manner whereby death could be inflicted.

In light of the extensive appellate authority on this issue, the trial court should have given a simple battery instruction as a lesser included offense on the aggravated battery charge against Simmons. In short, requisite issues—the degree of harm and the manner in which the defendant caused the harm—typically go to the jury for determination. On the facts here, we believe a reasonable

jury could have, though not necessarily would have, returned a verdict of guilty on simple battery had that option been made available.

We are bolstered in that conclusion with the advantage of hindsight. We can draw one clear signal from the verdict: the jurors rejected the State's allegation that Simmons caused Terry great bodily harm. If they had accepted that premise, they would have convicted Simmons of the severity level 4 offense rather than the severity level 7 offense. Instead, the jurors considered Terry's injuries to constitute bodily harm. That alone is a very practical demonstration that the evidence in this case would support a determination of the bodily harm element of simple battery. The jury came to precisely that conclusion on the degree of injury.

We likewise conclude that the jury should have been permitted to determine if the one or two punches Simmons directed at Terry inside the Jackson house amount to means by which great bodily harm could be inflicted. A jury reasonably and fairly might conclude not. This was not a circumstance in which Terry was subjected to an extended barrage of blows or repeatedly kicked in the head or struck with an object such as a table lamp or kitchen chair that, although not necessarily a deadly weapon, could have caused significant physical harm. And while we in no way excuse or minimize what happened to Terry, the calibration of the means Simmons used to inflict the injuries on her—one or two punches—should have been entrusted to the jury. Kansas law on aggravated battery and its lesser included offenses is well settled on the point. See, *e.g.*, *State v. Delacruz*, 43 Kan. App. 2d 173, 175, 180-81, 223 P.3d 810 (2010) (trial court erred in not instructing on the lesser included offense of simple battery where the evidence showed that Delacruz "punched [his wife] in the face, stomped on her head, sat on her arm, and choked her"); *Curreri*, 42 Kan. App. 2d at 462, 466 (jury question whether man who pushed his live-in girlfriend to the floor, got on top of her, and then manually strangled her almost to unconsciousness acted in a manner whereby great bodily harm could have been inflicted, thereby supporting a conviction for aggravated battery rather than simple battery); *State v. Vessels*, No. 96,421, unpublished opinion filed April 18, 2008 (Kan. App.)

*rev. denied* 286 Kan. 1185 (2008), slip op. at 9-13 (jury should have been instructed on lesser included offenses in aggravated battery prosecution where bail bondsman grabbed and twisted arm of arthritic, 65-year-old woman, breaking one of the bones in her forearm); *Quinones*, No. 93,848, slip op. at 2, 5 (indicating trial court correctly instructed on lesser included offense of simple battery where evidence showed Quinones punched and kicked a neighbor, breaking his nose and a left cheek bone).

We gather additional support for our conclusion in this case from another hindsight observation drawn from the record. Late in the day during its deliberations, the jury sent a list of three questions to the trial court. In the first question, the jury essentially asked if Count 1 (the instruction on simple battery) applied "to both the incident in the street <u>and</u> the incident in the house[?]" The question suggests the jury at least wanted to consider simple battery as an option on the aggravated battery charge. (Recall that Simmons had been charged with simple battery for hitting Terry when they both were outside near her car, and the trial court so instructed the jury. The jury never got answers to the questions. According to the record, the trial court informed the jury responses could not be provided until the next day. The jury then apparently told the bailiff that it wished to "withdraw" the questions and continued deliberating. The jury reached a verdict later that day. The instructions as submitted to the jury obviously did not permit consideration of simple battery—that is the error Simmons asserts.)

In short, this case presents a near prototypical example of when a lesser included instruction of simple battery ought to be given to a jury in an aggravated battery prosecution. We, of course, would not presume to suggest what a jury hearing the testimony, viewing the exhibits, and being properly instructed on the law would or should decide.

The State offers two arguments in support of the proposition that a simple battery instruction was legally unwarranted. As a careful reader may suspect, we find neither to be persuasive.

First, the State suggests that the injuries Terry suffered were such that no simple battery instruction should have been given. That is, Terry sustained great bodily harm as a matter of law,

thereby precluding a jury finding on simple battery. Under Kansas law, however, injuries of the sort Terry suffered present a jury question as to the degree of bodily harm. And, as we have pointed out, the jury in this case necessarily rejected the State's allegation that the injuries amounted to "great bodily harm" when it acquitted Simmons of a severity level 4 aggravated battery. The State also argues that the way in which the injuries were inflicted conclusively establishes a manner whereby great bodily harm could be done. But the State cites no case authority supportive of that argument. As we have outlined, settled Kansas law is otherwise.

Second, the State suggests the "skip" rule precludes any error in failing to instruct on simple battery as a lesser included offense. In broad terms, the skip rule suggests that if a jury convicts of an offense and, thus, rejects a lesser included offense on which it was instructed, then no error results from failing to instruct on an offense that is even lesser still. See *State v. Horn*, 278 Kan. 24, 43, 91 P.3d 517 (2004). But the rule is not really a rule at all in the sense that it must be invariably or even routinely applied. It *is*, rather, simply a logical deduction that may be drawn from jury verdicts in certain cases. If a jury convicts of a greater offense, having been given the opportunity to consider a lesser offense, and that verdict necessarily establishes a factual element that would be legally inconsistent with an even lower offense on which no instruction were given, the defendant cannot have suffered any prejudice from the failure to give that instruction.

In this case, for example, we have found that the jury should have been instructed on simple battery. But had the jury convicted Simmons of a severity level 4 aggravated battery, requiring proof of great bodily harm, thereby rejecting severity level 7 aggravated battery requiring proof only of bodily harm, we could reasonably conclude the jury determined Terry's injuries to be great bodily harm. In turn, even if the trial court had instructed on simple battery, also requiring proof of bodily harm, we could logically infer that the jury would have rejected that option, since it believed the injuries to be more severe. In other words, in that scenario, a jury finding of great bodily harm necessary to support a conviction for severity level 4 aggravated battery precludes any possibility of a

conviction for simple battery, which can be found only when the victim has suffered bodily harm. Accordingly, Simmons would have incurred no legal disadvantage even though the jury should have been given the option of considering simple battery. In that circumstance, the skip rule (or a logical examination of the jury's verdict) demonstrates that giving a simple battery instruction would have made no difference.

The same, however, cannot be said of the actual circumstances in this case. The State argues that the jury rejected the lesser included offense of severity level 8 reckless aggravated battery in favor of convicting Simmons of severity level 7 intentional bodily harm aggravated battery. And, therefore, the State says we may conclude the jury would have rejected simple battery if that option had been available. But that reasoning is doubly flawed.

The State assumes the jury considered and deliberately passed over reckless aggravated battery. Nothing in the jury instructions informed the jurors as to how or in what order they should have considered the lesser included offenses. The jury, therefore, may have given little or no consideration to reckless aggravated battery. Assuming the jurors did consider that offense, they more than likely rejected it because they believed Simmons' actions in punching Terry to be "intentional" rather than "reckless." And nothing in that determination would have precluded a verdict on simple battery if that option had been presented. Simple battery, like a severity level 7 bodily harm aggravated battery, may be based on intentional conduct. Accordingly, a jury could reject a lesser offense requiring reckless conduct without logically precluding or foreclosing consideration of some other lesser offense requiring intentional conduct.

In other words, simple battery and severity level 7 bodily harm aggravated battery share the common elements of intentional conduct and bodily harm. The distinction between the two is the manner in which the defendant applies the force to the victim. For a conviction of severity level 7 bodily harm aggravated battery, it must be in a manner whereby great bodily harm could be inflicted. If not, then the crime is simple battery, *i.e.*, intentional conduct of the defendant resulting in bodily harm to the victim. In this case,

the jury was never given the opportunity to consider whether or not Simmons' actions in punching Terry while she was in the Jackson home created circumstances whereby great bodily harm could have been inflicted. The jury should have been afforded that opportunity. Instead, the instructions imposed on the jury a forced choice between acquitting Simmons or finding he acted in a way that could have caused great bodily harm, though in this instance did not.

Nothing in the verdict predicts, conclusively or otherwise, how the jury would have resolved that issue. Even presuming the jury considered and rejected severity level 8 reckless aggravated battery, that would show only that it believed Simmons acted intentionally and not recklessly—a conclusion fully consistent with the elements of simple battery. Accordingly, the skip rule fails to neutralize the reversible error in denying Simmons an instruction on simple battery.

The conviction for severity level 7 bodily harm aggravated battery is reversed, and Simmons should be granted a new trial on that offense. K.S.A. 21-3108(5).

## JURY INSTRUCTION ON INTENT

Simmons objected to the trial court's decision to include the pattern instruction on inference of intent, PIK Crim. 3d 54.01, in the charge to the jury. He says the instruction was unwarranted on the facts and impermissibly shifts the burden of proof to the defendant in a criminal case. The instruction permits, but does not require, a jury to consider that "[o]rdinarily, a person intends all of the usual consequences of his voluntary acts." The instruction explicitly tells jurors they may accept or reject that inference in determining if the State has met its burden of proof on the issue of criminal intent. And the instruction cautions that the burden "never shifts to the defendant."

The Kansas Supreme Court has consistently upheld PIK Crim. 3d 54.01 against precisely that sort of challenge. *State v. Nelson*, 291 Kan. 475, 482-83, 243 P.3d 343 (2010); *State v. Ellmaker*, 289 Kan. 1132, 1143-44, 221 P.3d 1105 (2009); *State v. Stone*, 253 Kan. 105, 106-08, 853 P.2d 662 (1993). Especially given the recency of

*Nelson* and its clear pronouncement affirming the adequacy of PIK Crim. 3d 54.01, we cannot infer some retrenchment of the Supreme Court on the issue. Simmons' intent was at issue on the facts. The point provides no basis for relief.

## Assessment of Attorney Fees against Simmons

Simmons contends the trial court erred in assessing the costs of the services of his appointed public defender against him without taking into account his ability to pay and the impact those costs otherwise might have on his financial circumstances. The State counters that the trial court complied with the "spirit" of the governing statute. We believe the trial court erred.

Under K.S.A. 22-4513, the trial court is to assess the fees of defense counsel appointed through the Board of Indigents' Defense Services (BIDS) against a defendant who has been convicted. The amount is essentially treated as a civil judgment imposed on the defendant. The statute also requires that the trial court "shall take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose." K.S.A. 22-4513(b). The trial court must make that determination at the time the assessment is ordered. *State v. Robinson*, 281 Kan. 538, 546, 132 P.3d 934 (2006) ("[T]he sentencing court, at the time of the initial assessment, must consider the financial resources of the defendant and the nature of the burden that payment will impose *explicitly*, stating on the record how those factors have been weighed in the court's decision."). While the statute permits a defendant to later request modification of a BIDS assessment because of "manifest hardship," that process cannot replace the trial court's studied determination of an appropriate amount in the first instance. 281 Kan. at 544. The point, presumably, is to avoid loading additional financial obligations on a person of limited means if that burden would imperil rehabilitation efforts or, even worse, induce further criminal activity to pay the debt.

In this case, the trial court did not make even a rudimentary effort to comply with the statutory requirements. Instead, the court dispensed with any attempt at gauging Simmons' ability to pay, imposed the fee, and suggested that a hearing could be scheduled

later if the assessment created financial problems. While defense counsel had little information immediately at his fingertips regarding Simmons' financial resources, that did not allow the trial court to abdicate its duty. The trial court could have called a brief recess to allow lawyer and client to confer or could have continued the matter to another time, if necessary. In any event, the trial court failed to adhere to the requirements of K.S.A. 22-4513. While trial courts should be cognizant of efficiency in disposing of issues before them, that cannot become an ultimate goal to the detriment of mandated processes and required determinations.

On remand, the trial court should reconsider the imposition of the BIDS assessment in light of the statutory requirement for specific consideration of Simmons' ability to pay and of the impact those costs might have on his financial resources.

## USE OF PAST CONVICTIONS AT SENTENCING

Simmons argues that the trial court's use of his past convictions in determining an appropriate sentence impairs his constitutional rights because the fact of those convictions was not determined beyond a reasonable doubt by a jury. Simmons relies on the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), to support that proposition. He also acknowledges the Kansas Supreme Court has rejected that argument and has found the State's current sentencing regimen conforms to the Sixth and Fourteenth Amendments to the United States Constitution with respect to the use of a defendant's past convictions in determining a presumptive statutory punishment. *State v. Fischer*, 288 Kan. 470, Syl. ¶ 4, 203 P.3d 1269 (2009); *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). We, therefore, decline Simmons' invitation to rule otherwise.

Affirmed in part, reversed in part, and remanded with directions.